## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Magloire K. Placide Ayissi Etoh ) <br> 131 Summit Hall Road ) <br> Gaithersburg, MD, 20877 ) <br> Tel: 301-963-1972 ) <br>                Plaintiff, ) <br>       VS. ) <br> ) <br> Fannie Mae ) <br> 3900 Wisconsin, Avenue, NW ) <br> Washington, DC, 20016 ) <br>       and ) <br> Michael J. Williams, in his capacity of ) <br> Chief Executive Officer of Fannie Mae ) <br> 3900 Wisconsin Avenue, NW, DC, 20016; ) <br>       and ) <br> Jacqueline K. Wagner, in her capacity of ) <br> Former Chief Audit Executive of ) <br> Fannie Mae, 8484 WestPark Drive, ) <br> McLean, VA, 22102; ) <br>       and ) <br> Thomas Cooper, in his capacity of ) <br> Former Vice-President of Fannie Mae ) <br> 3900 Wisconsin Avenue, NW, DC, 20016 ) <br>       and ) <br> Sanda Pesut, in her capacity of ) <br> Manager at Fannie Mae ) <br> 4000 Wisconsin Avenue, NW, DC, 20016; ) <br>             Defendants. ) | CIVIL ACTION NO. 1:10-cv-01259 ESH <br><br> Hon. Ellen Segal Huvelle |

### AMENDED COMPLAINT

### (Trial by Jury Requested)

## PRELIMINARY STATEMENT

1.  Plaintiff hereby, comes and amends his Complaint.

2.  This amendment of the Complaint would be moot if Plaintiff's Motion for Default Judgment is granted



RECEIVED

SEP -1 2010

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

3.  This amendment of the Complaint is made pursuant to Federal Rule of Civil Procedure Rule 15 (a) (1) (A):  *"a party may amend its pleading as a matter of course: (A) before being served with a responsive pleading."*

4.  Because Plaintiff is amending his complaint and given the fact that Defendants Fannie Mae et al. have not served Plaintiff with a responsive pleading, Defendants' Fannie and al.'s "Motion to dismiss or in Alternative Motion for Summary Judgment" is now moot

    JURISDICTION AND VENUE

    Plaintiff, for his complaint against the defendants, alleges:

    JURISDICTION AND VENUE

5.  Plaintiff invokes this Court's jurisdiction under *28 U.S.C. § 1331* on the ground that this action arises under *42 U.S.C. § 1981*. Plaintiff invokes this Court's jurisdiction under tort laws. Plaintiff invokes this Court's jurisdiction with respect to his claims based on the common law of the District of Columbia.

6.  The venue of this action is properly placed in the District of Columbia pursuant to *28 U.S.C. § 1391* because the unlawful employment practices alleged below and plaintiff's claims arise in this district. Also, pursuant to the "Charter Act" Section 302 B: which stipulates: *"Fannie Mae, the body corporate known as Federal National Mortgage Association. The corporation shall maintain its principal office in the District of Columbia or the metropolitan area and thereof shall be deemed, for the purpose of jurisdiction and venue in civil actions, to be a District of Columbia corporation"*.

PARTIES

7. Plaintiff is a foreign born black citizen of the United States originally from Cameroon (Africa) and a resident of Gaithersburg, Montgomery County, Maryland. He was employed by the defendant at all times relevant to all allegations in this Complaint.

8. Fannie Mae is a federally chartered and stockholder-owned corporation and existing under federal statute section 1716 et seq. (the "Charter Act"). Pursuant to the "Charter Act" Section 302 B, Fannie Mae is a District of Columbia corporation. Fannie Mae is doing business in the District of Columbia, including business at a location in the North West of Washington DC.

9. Individual Defendant # 1: Mr. Michael J. Williams is a citizen of the United States and a resident of Washington DC and is the Chief Executive Officer of Fannie Mae. In his official capacity Mr. Michael J. Williams is a necessary party for complete relief to be afforded to the plaintiff.

10. Individual Defendant # 2: Ms. Jacqueline K. Wagner is a citizen of the United States and a resident of Washington DC Metropolitan area and is the former Chief Audit Executive of Fannie Mae. In her official capacity Ms. Jacqueline Wagner is a necessary party for complete relief to be afforded to the plaintiff.

11. Individual Defendant # 3: Mr. Thomas Cooper is a citizen of the United States and a resident of the State of Virginia. Mr. Thomas Cooper was a contractor with Ernst and Young, LLC from about June 2008 to December 2008. Mr. Thomas Cooper became a Fannie Mae employee in about the end of January 2009 and held the position of Vice-President of Fannie Mae and is thus a necessary party for complete relief to be afforded to the plaintiff.

12. Individual Defendant # 4: Ms. Sanda Pesut is a citizen of the Republic of Serbia and a resident of Washington in the District of Columbia and is a Manager at Fannie Mae. In her official capacity Ms. Sanda Pesut is a necessary party for complete relief to be afforded to the plaintiff.

PRE-REQUISITES PROCEDURES

13. Plaintiff completed all steps for filing a claim in court against Fannie Mae.


STATEMENT OF FACTS

14 Plaintiff is a Ph.D. educated individual, he received his education from Georgetown University's Ph.D. in Economics Program, and from the Institute of Political Studies of Paris –France-where he studied from the freshman year to the Doctorate in economics.

15. Fannie Mae hired Plaintiff as Senior Financial Modeler within the Internal Audit Department along with firm promises that Plaintiff will enjoy camaraderie, good working environment with transparent and open communication and a competent Management.

16. Plaintiff's official starting date was April 28, 2008. On April 29, 2008. Plaintiff actual duty started, Mr. Philip Schlemmer told Plaintiff that he will be reporting directly to him the Director, not to the Manager Sanda Pesut, because Ms. Sanda Pesut lacks the credential to supervise Plaintiff.

17. Under Mr. Philip Schlemmer direction, Plaintiff performance was deemed excellent. Plaintiff earned a reputation as a very bright individual and an excellent employee. In July 2008, Plaintiff became an award winning employee for his exceptional work: Plaintiff won the "Cool Reward Award" given to employee to recognize specific examples of exceptional performance by employees.

18. In March 2008, Ms. Jacqueline Wagner was hired by Fannie Mae as the Senior Vice-President and Chief Audit Executive (CAE) over the Company's Internal Audit Department. Early July 2008, Ms. Jacqueline Wagner restructured the Internal Audit Department. Mr. Philip Schlemmer was moved to another division. Plaintiff would now report to Ms. Sanda Pesut effective August 17, 2009. Ms. Jacqueline Wagner also announced the creation of fourteen (14) Team Lead positions, including a Modeling Team Lead Position. Ms. Jacqueline Wagner created an Interview Panel/Jury to conduct the interviews and to select candidates to fill these positions.

19. Plaintiff applied, competed, and was selected by the Interview Panel/Jury for the Modeling Team Lead:

20. Plaintiff, a black man, competed for the Modeling Team Lead position against Mrs. Karla Kucerkova, a white candidate. During the deliberations of the Panel/Jury, when the Panel announced their selection for Modeling Team Lead position, they selected Plaintiff, a black male, over Mrs. Karla Kucerkova, a white woman: the white authorities at Fannie Mae Internal Audit Department (Mr. Thomas Cooper and Ms. Sanda Pesut) explicitly expressed their discontent for this selection of Plaintiff, a black male, over Mrs. Karla Kucerkova, a white woman.

21. The jury nevertheless insisted on their selection of Plaintiff, a black man, as the best candidate for the position and maintained their selection despite the strong opposition of the white authorities of the department. The jury insisted that Plaintiff was overqualified for the position if anything. Faced with the firmness of the jury that Plaintiff, a black man, has overperformed the white candidate during the selection process, and the insistence of the jury on the fact that Plaintiff was way overqualified relative to the white

candidate for the position, Ms. Jacqueline K. Wagner despite her racial animus confirmed the promotion of Plaintiff in the Modeling Team Position as selected by the jury

22. Ms Jacqueline K. Wagner (Fannie) Mae intentionally denied Plaintiff a salary increase with his jury selected promotion because Plaintiff a black man, who defeated a white candidate for the position, and foiled Ms. Jacqueline K. Wagner's plan of "Executive Presence" for the management team. Ms. Wagner discriminated against Plaintiff on the basis of race and national origin by authorizing compensation increases for the white candidate who lost the competition for the Modeling Team Lead, Karla Kucerkova, and by denying a salary increase for the winner of the competition Plaintiff, a black man.

23. On October 31, 2008, Ms. Jacqueline K. Wagner explicitly referred to Plaintiff's race when Plaintiff asked why he had not received a pay increase upon his selection as the Modeling Team Lead. Ms. Jacqueline K. Wagner said: *"for a young black man smart like you, we are happy to have your expertise; I think I'm already paying you a lot of money"*.

24. Ms. Jacqueline K. Wagner, employed executive discretion in a discriminatory manner against the Plaintiff because of his race.

25. When explaining her discretionary decisions, no increase for Plaintiff and raise for the white candidate who lost, Ms. Wagner stated to a Human Resources Representative that her decisions to instead raise the salary of Karla Kucerkova, the white candidate who lost, was intended to prevent the employee (Karla Kucerkova, the white candidate) from becoming discouraged about not being selected as a Team Lead.

26. In the mind and the intentional discrimination of Ms. Jacqueline K. Wagner, a white employee who lost a promotion competing against a black man would become discouraged.

27. In the mind of Ms. Jacqueline K. Wagner, only a white candidate who lost the
competition against a black man would become discouraged. For Ms. Jacqueline K.
Wagner the black candidate (s) who lost the competition would not be discouraged as if
black employees have no feelings: Ms. Wagner's actions and discretion did not authorize
a salary increase for the black candidates, like Oluwaseyi Awoga who lost the
competition for Team Lead. Furthermore, no white candidate, like John Mc Neal who
lost against another white candidate received any salary increase. Only when a black man
prevailed over a white candidate that Ms. Wagner taught that she should prevent the
white candidate from becoming discouraged: it must be very discouraging for a white
person to be defeated by a black candidate in a fair competition in Ms. Wagner's world.

28. This adverse employment action, from this unlawful act of Jacqueline K. Wagner
denying a salary increase with the promotion to the winner because he is black (Plaintiff)
and subsequently giving the salary increase to the loser because she is white (Karla
Kucerkova); this adverse employment action caused Plaintiff a loss of income of about
$10,000 per year starting in year 2008.

29. The circumstances of the above discrimination were those of a racially discriminating and
hostile work environment created by Ms. Jacqueline K. Wagner who eliminated Internal
Audit's participation in the H1-B visa program through which every other department of
the Company continues to sponsor international employees to work at Fannie Mae.

30 Ms. Jacqueline K. Wagner created a discriminatory and hostile work environment by
emphasizing "executive presence" as a qualification for employees in Internal Audit,
which has had the effect of devaluing employees who are minorities or foreign nationals,
particularly those minorities employees with foreign accents.

31. Plaintiff was given a promotion in name but not in responsibilities: Fannie Mae refused to give Plaintiff his leadership role and Plaintiff continued to perform only staff-level tasks from August 2008 to December 2008. Plaintiff raises this issue twice before telling Ms. Pesut that he will escalate the issue to Ms. Jacqueline K. Wagner.

32. As provided by Fannie Mae to Plaintiff on February 19, 2010, an alleged and DOUBTFUL e-mail was sent by Ms. Sanda Pesut on October 1st, 2008 at 8:18 AM, from office computer located in the South Building at 4000 Wisconsin Avenue, NW, Washington DC, 20016 and received by a third party, a contractor from Ernst and Young, LLC Mr. Thomas Cooper, contained two attachments: 1- "SDQ model questions (for Internal Audit).msg" and 2-"Soundness of inputs.doc" . The first attachment "SDQ model questions (for Internal Audit).msg" is a copy of an e-mail received by Plaintiff from a customer and Plaintiff gave Ms. Pesut a printed copy of the e-mail only, and the second attachment -"Soundness of inputs.doc" a "word document" was created by Ms. Sanda Pesut. This e-mail concerned the "SDQ Model" in the "Single Family Underwriting and Quality Assurance Audit" and what is allegedly stored on TeamMate (software). On this e-mail, Ms. Sanda Pesut maliciously attached a -"Soundness of inputs.doc" "word document" that she fabricated herself and maliciously attributes the preparation of this "Soundness of inputs, word document" to Plaintiff. Ms. Pesut alleged in the e-mail that *"word file one of the workpapers in TeamMate where reasonableness of data inputs is assessed- bulleted part is exactly the same as customer response on page 2" "word file attached to the e-mail above.*

33. The "Soundness of inputs.doc" "word document" was not prepared by Plaintiff and was never in TeamMate as stated by Sanda Pesut in the e-mail

34. By creating and sending this false and inflammatory information about Plaintiff to Mr.
   Thomas Cooper, a third party and Contractor, Ms. Pesut violated the Company's
   prohibition on contractors supervising or directing Fannie Mae employees.

35. On October 10, 2008, between 3:25 PM and 3:40 PM, Plaintiff discussed with and told
   Ms. Sanda Pesut that he will escalate his lack of leadership role issue to Ms. Wagner.

36. On October 10, 2008, around 4 PM, Ms. Sanda Pesut went to Ms. Jacqueline K.
   Wagner's office located in the South Building at 4000 Wisconsin Avenue, NW,
   Washington DC, 20016 and falsely accused Plaintiff of intellectual theft. Ms. Sanda
   Pesut presented a printed copy of the same Ms. Pesut's fabricated "Soundness of
   inputs.doc" and a printed copy of the e-mail "SDQ model questions (for Internal Audit)
   to Ms. Jacqueline K. Wagner. Ms. Sanda Pesut alleged that the "Soundness of
   inputs.doc" word document that she fabricated herself was prepared and stored in
   TeamMate by Plaintiff. Ms. Pesut also alleged that the e-mail "SDQ model questions (for
   Internal Audit)" received by Plaintiff *is exactly* the same as Plaintiff's work. Ms. Pesut
   then verbally accused Plaintiff of plagiarism (the exact accusation in the word of Ms.
   Jacqueline K. Wagner *"She (Ms. Pesut) said that you (Plaintiff) took the customer's work
   and made it pass as yours")*.

37. Without checking the contention, on October 10, 2008, Ms. Jacqueline K. Wagner
   presumed the Plaintiff guilty of the crime and sentenced him without due process to
   denial of retention bonus (about $10,000 to $400,000 per year for 3 years). Ms.
   Jacqueline K. Wagner never even bothers to call Plaintiff to tell him that he is being
   accused of intellectual theft. During this October 10, 2008 meeting, Ms. Jacqueline

Wagner ordered Ms. Sanda Pesut to create a "Short Form Evaluation" and document this Plaintiff's alleged intellectual theft and to put it on Plaintiff's file.

38. On October 14, 2008, as requested by Ms. Jacqueline K. Wagner, Ms. Sanda Pesut delivered two overwhelmingly negative "short form" evaluations including the "plagiarism' allegation reflected in one of those evaluations ("Single Family Underwriting and Quality Assurance" audit).

39 On October 15, 2008 based on the false accusation of plagiarism, Ms. Jacqueline K. Wagner, denied Plaintiff a retention bonus (provided to almost every employee after the "Conservatorship" in an amount between $10,000 to $400,000 per year for 3 years).

40. On October 16, 2008, Plaintiff met with Ms. Jacqueline K. Wagner for complaints: denial of leadership role, work atmosphere, and salary discrimination. This October 16, 2008 meeting quickly deviated from the topic as Ms. Jacqueline K. Wagner told Plaintiff: "*I don't know what to tell you (Plaintiff) about your complaints because you (Plaintiff) have been accused of plagiarism and I've already sentenced you to loss of retention bonus*". Ms Jacqueline K. Wagner said: *"What bothers me is that she (Ms. Pesut) said that you (Plaintiff) took the customer's work and made it pass as yours" "That why I don't know what to say about your situation with her"*. Ms. Wagner explained that kind behavior is unacceptable, plagiarism is a serious offense, and auditors need honesty and integrity. Ms. Wagner explained to Plaintiff that by plagiarizing the customer work, Plaintiff has shown that he lacks honesty and integrity. Ms. Wagner clearly made the point that Ms. Pesut's accusation of plagiarism explains her decision to deny Plaintiff the retention bonus: *"that's why I didn't give you a retention bonus yesterday"*.

41. Ms. Jacqueline K. Wagner explained to Plaintiff that Ms. Pesut said that: *the "1 page document" called "Soundness of inputs.doc" is exactly the same as the answers from the customer's e-mail".* Ms. Jacqueline K. Wagner told Plaintiff that: *"she (Ms. Pesut) said that you (Plaintiff) just copied the customer e-mail answers to TeamMate and you (Plaintiff) did not do any test work on your own. That the "1 page document" called "Soundness of inputs" is a pure re-creation of the model developer's e-mail".*

42. On this October 16, 2008 meeting, Plaintiff was surprised and claimed his innocence. Plaintiff himself gave Ms. Sanda Pesut a printed copy of the e-mail "SDQ model questions (for Internal Audit), in the morning of October 10, 2008 to show where the definitions of the variables came from. Plaintiff tested the customer model assumptions and documented all his work on Teammate. Plaintiff's work in TeamMate was not a 1-page document as maliciously presented by Ms. Sanda Pesut, but a 7 pages document with substantial statistical analysis and testing of the customer's variables.

43. Plaintiff requested a fact check. Plaintiff explained to Ms. Jacqueline K. Wagner that the document presented by Sanda Pesut as well as Ms. Pesut's accusation of plagiarism are certainly false and can be proven easily by checking two things: 1) what is stored in TeamMate and 2) the audit trail if Plaintiff were to change the document in question now that Plaintiff is aware of the charges (October 16, 2008).

44. Ms. Jacqueline K. Wagner said: *"I realize that I may have acted prematurely, I also realize that every story has two sides. I tell you what; I will ask someone not involved with you two to check the facts. And we will reconvene on your concerns in about two weeks when the facts will be checked".* The meeting was adjourned.

45  In late October 2008, Mr. Thomas Cooper, at Ms. Jacqueline K. Wagner's request, reviewed Plaintiff's workpapers related to the Single Family Underwriting audit to determine whether Ms. Pesut's "plagiarism" allegation as reflected' in her written comments attached to her short form evaluation was valid.

46. On October 31st, 2008, Plaintiff met with Ms. Jacqueline Wagner as a follow-up of their October 16, 2008 meeting. For the false accusation of plagiarism, Ms. Jacqueline Wagner, said *"we checked it, you didn't do it, otherwise you wouldn't be here"*. Ms. Wagner advised Plaintiff that she had determined that Plaintiff did not plagiarize customer's work. Ms. Sanda Pesut's accusation of plagiarism was proven to be false and inflammatory. Plaintiff then asked Ms. Jacqueline Wagner to reverse the decision of denial of retention bonus based on the assumption that Plaintiff was guilty of the intellectual theft. Ms. Jacqueline Wagner said nothing about reversing the rushed decision. Fannie Mae also did not clear Plaintiff's file of the overwhelmingly negative evaluation based on the false accusation of plagiarism. Plaintiff then raised anew the issue of not receiving a salary increase with his promotion. Ms. Jacqueline Wagner then told Plaintiff the following: *"for a young black man smart like you, we are happy to have your expertise; I think I'm already paying you a lot of money."*

47. Adapting his behavior to the tone at the top from Ms. Jacqueline K. Wagner, who created a discriminatory and hostile work environment against foreign born minorities who spoke with an accent, Thomas Cooper, recruited as Vice President Internal Audit starting January 2009, created a hostile work environment for the Plaintiff; continuously harassed Plaintiff in a demonstrated racial animosity.

48. On Monday February 23, 2009, at 4:20 PM, late for a 4:00 PM status meeting of the "Model Development Compliance" audit, with Plaintiff and Ms. Sanda Pesut, Mr. Thomas Cooper with a mean look said to Plaintiff with a rude tone *"what do you want?"*

49. On Friday February 27, 2009 during lunch time of a training class, several Fannie Mae employees, including Plaintiff, Mr. Naveen Fernandes, Mrs. Noelle Lipscomb, Maribel Garrido-Pagan, were using the Health Machine for their health assessment. Mr. Thomas Cooper's blood pressure results were high, and Mr. Thomas Cooper said in a very mean tone: *"it is Placide (Plaintiff) who is raising my blood pressure".* Plaintiff was offended, and scared of Mr. Cooper animus and walked away. Mr. Fernandes told Plaintiff *"you didn't deserve that; don't mind him".*

50. On March 05 2009, Mr. Cooper made several hurtful comments to Plaintiff during Plaintiff's Year-End Performance review meeting attended by Mr. Thomas Cooper, Mr. Sanda Pesut. Plaintiff explained to Mr. Cooper that the team turned against him (Plaintiff) since his promotion to Modeling Team Lead over the losing white candidate Karla Kucerkova, and that the team has made every effort to undermine Plaintiff's work. Mr. Thomas Cooper in a very inappropriate tone said "I *would not have promoted you".* Second, when reviewing Plaintiff's Year End evaluation form, Plaintiff noticed a lot of fabrications and inaccuracies. Out of context, Mr. Thomas Cooper said: *"Don't you think you will be more successful in another department?"* Plaintiff was surprised that Mr. Cooper wanted him out of his department. As the discussion continued, Mr. Thomas Cooper asked Plaintiff again: *"Do you think you will be more successful in another division?* Mr. Cooper continued asking Plaintiff to go to another department and asked Plaintiff: *"how long have you been with Fannie?"* Plaintiff answered 11 months.

51. These March 5, 2009 Mr. Cooper's comments were demoralizing for Plaintiff work and effort. Plaintiff understood that he was not wanted in his department and that Mr. Thomas

Cooper still holds bitterness on the fact that Plaintiff was selected by the Jury for the Modeling Team Lead position over the white candidate, Karla Kucerkova. The work environment for Plaintiff was becoming more and more pervasive.

52. On March 11, 2009, Plaintiff formally filed a complaint with Fannie Mae's Compliance and Ethics Department: racial discrimination, hostile work environment...

53. On March 16, 2009, during a meeting of the association of Team Leads, Plaintiff discovered that he was the only Team Lead who was still doing staff-level task, also called test work, on top of his management responsibilities as Team Lead.

54. On March 17, 2009 during a 1-on-1 meeting with Ms. Sanda Pesut, Plaintiff raised the issue of him being the only Team Lead still required to do "staff-level test work" despite having the same responsibilities and job description as other Team Leads. Ms. Sanda Pesut told Plaintiff that: *"we can always modify your (Plaintiff) job description"*. Plaintiff told Ms. Pesut that modifying only Plaintiff's job description in order to continue to require him to do staff-level test work would be disparate treatment.

55. On March 18, 2009, the Internal Audit Management sent-out to all employees their goals and job tasks for the year. When the team discussed the Team Lead task and goals, Plaintiff noticed that the Team Lead tasks do not include doing "staff-level test work". Plaintiff told Ms. Sanda Pesut: *"you see, as I told you yesterday, Team Lead don't do test work. Now it is official with the goals. Going forward, I should not be doing test work"*

56. On March 18, 2009 at 6:34 PM, Mr. Cooper sent an e-mail to Plaintiff with just a title: "come see me tomorrow" with no other instruction on the e-mail itself, just; *"Regards"*

57. On March 19, 2009, Plaintiff went to see Mr. Thomas Cooper in his office.

58. In a very demeaning way, Mr. Thomas Cooper said in a very totalitarian voice and piercing eyes: *"For test work, you doing test work".*

59. Plaintiff *answered: "No heuh..."*

60. Mr. Thomas Cooper cut Plaintiff off, with force and hitting his chest with his two thumbs and other fingers closed for a fist Mr. Thomas Cooper said *"As the Vice President of this company, I'm telling you, you doing test work!"*

61. Plaintiff said: *"that is not what my job description or neither my contract nor the goals say"*

62. Mr. Thomas Cooper *"do you have a contract or a job description?*

63. Plaintiff said: *"yes, I don't have it with me"*

64. A few exchanges later, Mr. Thomas Cooper lost his temper, with a rage and a very mean look he pointed at the door and said *"get-out of my office"*

65. Plaintiff was slow to move as he was trying to continue to plead his position, Mr. Thomas Cooper de-humanized Plaintiff. Mr. Thomas Cooper pointed the door with rage a said *"get out of my office nigger"!* Plaintiff was in shock and left the room very offended, extremely outraged and Plaintiff was feeling ill. Plaintiff went straight to Fannie Mae's Compliance and Ethics and filed a complaint against Mr. Thomas Cooper about his racial slur and de-humanization.

66. Plaintiff was still in shock and felt more and more physically ill after this confrontation with Mr Thomas Cooper, even after talking to Compliance and Ethics. Feeling worse and worse, Plaintiff requested and was granted an early leave that day, March 19, 2009; to seek medical attention.

67. Plaintiff saw a medical doctor that day: Mr. Thomas Cooper dehumanizing treatment and racial slur was so severe that it triggered Plaintiff's diagnosed anxiety disorder. Mr.

Thomas Cooper also caused Plaintiff physical pain and suffering, emotional distress and mental anguish.

68. On March 20, 2009 Plaintiff complained about Mr. Thomas Cooper's actions to Fannie Mae's Chief Executive Officer Mr. Herbert Allison.

69. Fannie Mae instructed Plaintiff to continue to perform his work under Mr. Cooper, this enabled Mr. Thomas Cooper to continue to inflict Plaintiff emotional distress and to aggravate Plaintiff's diagnosed anxiety disorder.

70. Mr. Cooper continued to racially harass Plaintiff: mean looks, demeaning tone to order Plaintiff: *"in my office"*. This continued harassment scared Plaintiff and alter the working conditions for Plaintiff. Plaintiff was in constant anxiety every time Ms. Cooper ordered him to his office for meetings or just for simple questions about his work. It became difficult for Plaintiff to perform his work with the constant harassment of Mr. Cooper. Plaintiff was so outraged, and coped with anxiety disorder as he felt powerless and without any help from Fannie Mae who let this situation persevere for too long.

71. For several months after Plaintiff went forward and complained, Fannie Mae allowed Mr. Cooper to continue to have 1-on-1 meetings with Plaintiff behind closed door in the same room where Mr. Cooper de-humanized Plaintiff and call him a "nigger". This discriminatorily abusive work environment seriously affected Plaintiff's psychological well-being; Plaintiff was discouraged from remaining on the job and seriously taught about quitting.

72. It was incomprehensible to Plaintiff that despite the fact that Fannie Mae has a policy forbidding racial harassment on paper and has in place a system to respond to complaints of racial harassment; and the fact that Plaintiff availed himself of that system by filing several complaints; Fannie Mae did not resolve complaints within the 30-days investigation time they gave to plaintiff on March 25, 2009; a violation of Fannie Mae's own policy. Fannie Mae failed to

exercise reasonable care to prevent and correct promptly any racially harassing behavior against Plaintiff.

73. In a letter dated May 26 2009, Plaintiff complained to Mr. Michael J. Williams, the new CEO of Fannie Mae, about this Fannie Mae's failure to act promptly.

74. It is only on June 15, 2009 that Fannie Mae finally fired Vice-President Mr. Thomas Cooper as the Fried Frank Attorneys Investigative Report found that Mr. Thomas Cooper has indeed harassed Plaintiff because of his race and ordered Plaintiff out is office in a very heinous way and said "get-out of my office Nigger".

75. On July 06 2009, the Senior Vice-President and Chief Audit Executive Officer Ms. Jacqueline K. Wagner had to leave the company following the Investigation.

76. Plaintiff was ridiculed and called names throughout the organization after these upper-management firings. Ms. Sanda Pesut consistently made unplanned additional requests unrelated to Plaintiff's work very close to when Plaintiff's reports were due. Fannie Mae distorted facts and created documents with misleading statements about Plaintiff.

77. On August 07, 2009 Plaintiff filed Charges of Discrimination against Fannie Mae with the Equal Employment Opportunity Commission (EEOC).

78. On September 22, 2009, Ms. Sanda Pesut asked Plaintiff to forgo claims against Fannie Mae or be fired. Ms. Sanda Pesut told Plaintiff that Ms. Patricia Black, the acting Chief Audit Executive, told her that she (Patricia Black) has the "go-ahead" from Mr. Michael Williams, the CEO, to fire Plaintiff if he doesn't drop his claims against Fannie Mae. Plaintiff refused to forgo claims against Fannie Mae.

79. On October 12, 2009, Fannie Mae fired Plaintiff as the Modeling Team Lead and replaced him with Karla Kucerkova, the white candidate over whom Plaintiff has prevailed for the Team Lead position.

80. On October 12, 2009, Fannie Mae gave the Plaintiff a Bad Check.

81. On October 13, 2009, Plaintiff's banks (Chevy Chase Bank) as well as Fannie Mae's
bank (Bank of America) dishonored the check and treated Plaintiff as a criminal. Each of
the banks threaten to call the police if Plaintiff did not leave the bank, Plaintiff feared for
his life, Plaintiff was afraid of police brutality and possible death under the violence of
armed police. Fannie Mae has put Plaintiff in physically harm. This caused Plaintiff
embarrassment, humiliation and fear of death by police brutality that caused to Plaintiff
more emotional distress and mental anguish.

82. On October 15, 2009, after being humiliated and in harms way at the bank while
presenting a Fannie Mae's check. Plaintiff contacted Fannie Mae's Human Resource
about the check. Fannie Mae affirmed that check no: 58511 was a live check and told
Plaintiff to cash the check. On October 16, 2009 Plaintiff returned to Bank of America
and could not cash the check again. Plaintiff was outraged that Fannie Mae sent him back
to the bank with a phony check.

83. On October 29, 2009, Plaintiff sent a Notice of Dishonored Check to Mr. Michael J.
Williams, CEO of Fannie Mae.

84. Mr. Michael J. Williams forwarded Plaintiff notice of dishonored check to Fannie Mae
attorney. Fannie Mae by his attorney, Damian Stewart, sent Plaintiff an e-mail stating the
following: *"Your message to Mike Williams (below) was forwarded to my attention.
Please know that we have verified with our payroll department and Bank of America, the
financial institution on which your final paycheck was drawn, that check no: 58511 is
valid and not subject to any hold or other impediment by Fannie Mae of B of A. You may*

*cash the check at any B of A branch (a small fee will be required if you are not an*
*account holder)".*

85. In the above clear and plain language, Fannie Mae, after allegedly double checking the
validity of the check, sent Plaintiff back to the bank to be physically in danger including
the possibility of being killed by the police while committing a felony at a bank: trying to
cash a phony check.

86. On October 29, 2009 as directed by Fannie Mae's attorney, Plaintiff went to a different
Bank of America Branch to cash check no: 58511. The bank could not cash the check and
the bank clerk told Plaintiff that the check was a forgery, and that trying to cash a phony
check can get him in prison. The bank's clerk turned and started to dial a number on the
phone on the back counter. Plaintiff feared the bank clerk was calling the police. Plaintiff
ran-out of the bank; Plaintiff remove himself from the area before the police could get
there.

87. Plaintiff was so angered and emotionally distressed by the situation as Fannie Mae has
recklessly or intentionally sent him back again to be in harms way in the bank. On
October 30, 2009, Plaintiff sent Mr. Michael J. Williams, CEO of Fannie Mae a letter to
notify him that Plaintiff tried anew to cash the check no: 58511 without success.


INCORPORATION OF ALLEGATIONS

88  Allegations in the foregoing paragraphs are incorporated by reference into the following
claims for relief as if fully set forth in each such claim.

VIOLATIONS ALLEGED

COUNT I: (Racial Discrimination) *42 U.S.C. § 1981*

89. After a fair competition in front a Jury/panels for a Modeling Team Lead Position at
    Fannie Mea where a black man (Plaintiff) and a white candidate (Karla Kucerkova)
    competed, Plaintiff was selected by the jury and prevailed over the white candidate.
    Because Plaintiff is black, Fannie Mae, by the discretionary decision of his Senior-Vice
    President and Chief Audit Executive Ms. Jacqueline K. Wagner, denied Plaintiff a salary
    increase with his promotion while giving the salary increase instead to the white
    candidate over whom Plaintiff has prevailed. Fannie Mae's (Ms. Jacqueline K. Wagner)
    decision was predicated upon racial discrimination against Plaintiff. The defendants
    Fannie Mae and Jacqueline K. Wagner have deprived plaintiff of his right to the full and
    equal enjoyment of all benefits, privileges, terms, and conditions of plaintiff's
    employment at Fannie Mae because of plaintiff's race and/or national origin in violation
    of *42 U.S.C. § 1981.*

90. Plaintiff has been damaged by virtue of defendants' conduct alleged in the foregoing
    paragraph in the same manner as alleged in paragraphs 19 through 30, and 47 above,
    which are incorporated herein by reference, and Plaintiff is entitled to recover these
    damages from Fannie Mae.


        COUNT II DEFAMATION PER SE

Defamation: violation of Restatement (Second) of Torts § 558-559, 570-574 and/or the District
of Columbia Defamation Law

91. The allegations set forth in Paragraphs 32 through 46 above are referenced and
    incorporated as if fully set forth herein.

92. Defendants Sanda Pesut made false and defamatory accusations of plagiarism concerning Plaintiff that was harmful to Plaintiff in violation of Restatement (Second) of Torts § 558-559, 570-574 and/or the District of Columbia Defamation Law.

93. Ms. Pesut's accusation and actions referenced in paragraph 32 through 46 imply several acts of moral turpitude: that Plaintiff has plagiarized customer work; that Plaintiff deceives his reviewers and other readers of his work stored in TeamMate by presenting the work as is own when Plaintiff did not do any testing of the customer variables; that Plaintiff is guilty of intellectual theft. Ms. Pesut's accusation and actions, individually and taken as a whole in context of the communication to Mr. Thomas Cooper and later to Ms. Jacqueline K. Wagner, are defamatory because they falsely impute to Plaintiff dishonesty and lack of integrity, fraud and deceit, as well as the commission of intellectual theft, in a manner ruinous to the reputation and esteem of Plaintiff professionally, in his place of employment, and with acquaintances. Defendant Sanda Pesut's unlawful and improper actions caused Plaintiff general and special damages in the form of injury to his reputation throughout the Internal Audit department at Fannie Mae and in Plaintiff's community. These damages include, but are not limited to: Plaintiff's economist expertise credibility being compromised, loss of retention bonus between $10,000 to $400,000 a year for 3 years from Fannie Mae, negative employee's file, career opportunities as Modeling Team Lead immediately and seriously jeopardized, loss of pursuit of other job opening opportunities in other Fannie Mae's departments. Ms Pesut's accusation and actions, therefore, severely injured Plaintiff's reputation.

94. Plaintiff has been damaged in the manner set forth in paragraph 32 through 46 above and is entitled, by virtue of Restatement (Second) of Torts § 558-559; 570-574 and/or the

District of Columbia Defamation Law, to recover from Fannie Mae (and any other defendant whom plaintiff learns has instructed, neglected or refused to prevent the wrongful acts alleged) all damages resulting from such wrongful neglect or refusal.

COUNT III:  (Hostile Work environment) *42U.S.C. § 1981*

95. The allegations set forth in Paragraphs 29, 30, 47 through 65, and 68 through 74, above are referenced and incorporated as if fully set forth herein.

96. Mr. Thomas Cooper, a Vice-President at Fannie Mae, harassed and demonstrated racial animus against Plaintiff. Mr. Thomas Cooper called Plaintiff who is African-American, a "nigger" while demanding that Plaintiff leave his office following a dehumanizing discussion regarding Plaintiff's job responsibilities. With the racial harassment actions of Mr. Thomas Cooper toward Plaintiff, equality in terms and conditions of employment were violated as Fannie Mae maintained for too long an abusive and hostile work environment tainted racially and with racial slur, which was severe and pervasive for Plaintiff.

97. Defendants Thomas Cooper, Michael J. Williams, Jacqueline K. Wagner and Fannie Mae subjected Plaintiff to racial harassment and thus a hostile work environment in violation of *42 U.S.C. Section 1981.*

98. Defendants Fannie Mae, and Mr. Michael J. Williams have allowed a racially hostile work environment to prosper against Plaintiff in violation of Plaintiff's right to *"make and enforce contracts" which extends to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.",* a violation prohibited under *42 U.S.C. § 1981.*

99. Plaintiff has been damaged by virtue of defendants' conduct alleged in the paragraphs 29, 30, 47 through 65, and 68 through 74 above, which is incorporated herein by reference, and is entitled to recover these damages from Fannie Mae or the proper defendants.

COUNT IV, Intentional or negligent infliction of emotional distress, mental anguish and anxiety disorder, Restatement (2nd) of Torts § 46

100.        The allegations set forth in Paragraphs 48 through 51, and 56 through 65, and 68 through 74 above are referenced and incorporated as if fully set forth herein

101.        Defendants Thomas Cooper, by extreme and outrageous conduct recklessly or negligently caused severe emotional distress, mental anguish, anxiety disorder and physical pain to Plaintiff in violation of Restatement (Second) of Torts § 46. Plaintiff has been damaged in the manner set forth in paragraphs forth in Paragraphs 48 through 51, and 56 through 65, and 68 through 74 above and is entitled, by virtue of Restatement (Second) of Torts § 46 and/or the District of Columbia Tort Law, to recover from Fannie Mae all damages resulting from such wrongful tort.

COUNT V (RETALIATION) *42 U.S.C. § 1981*

102.        The allegations set forth in Paragraphs 77 through 79 above are referenced and incorporated as if fully set forth herein.

103.        Defendant Fannie Mae follows a practice of arbitrary discharge and continuously retaliates against employees of African origin.

104.        Because Plaintiff filed charges of discrimination against Plaintiff with the EEOC, defendant Fannie Mae retaliated and wrongfully terminated Plaintiff in violation of *42 U.S.C. Section 1981.*

105     As a further result of defendants' above-stated actions, the plaintiff has been and

is being deprived of income in the form of wages and prospective retirement benefits,

social security and other benefits due to him as an employee in a sum to be proven at

trial, because of plaintiff race and because he filed complaints of discriminations against

the defendants.


COUNT VI: Intentional or negligent infliction of emotional distress, mental anguish;

Restatement (Second) of Torts § 46 and/or the District of Columbia Tort Law

106.    The allegations set forth in Paragraphs 80 through 87 above are referenced and

incorporated as if fully set forth herein.

107.    Defendants Fannie Mae, by extreme and outrageous conduct recklessly or

negligently caused Plaintiff severe emotional distress and mental anguish, in violation of

Restatement (Second) of Torts § 46 and/or the District of Columbia Tort Law

108.    As a result of defendants Fannie Mae, Plaintiff was put in harms way and feared

for his life. Plaintiff incurred financial expenses for treatment of the Fannie Mae's

inflicted emotional distress and mental anguish.

109.    Plaintiff has been damaged in the manner set forth in paragraphs forth in

Paragraphs 80 through 87 above and is entitled, by virtue of Restatement (Second) of

Torts § 46 and/or the District of Columbia Tort law, to recover from Fannie Mae all

damages resulting from such wrongful tort.

WHEREFORE, plaintiff respectfully prays this Court to:

1. Order defendant Fannie Mae to make whole the plaintiff by providing appropriate back pay, lost retention bonus, lost wages, and reimbursement for lost 401K contribution, social security and other benefits, plus interest.

2. Plaintiff demands judgment against Defendants, essentially Fannie Mae, as follows:

   (i) Compensatory damages: On Count I in the amount of $18,570; on Count II in the amount of $137,173; on Count IV in the amount of $1,00,250 (including $1 million for pain and suffering) on Count V in the amount of $15; on Count VI in the amount of $120,386

   (ii)   Punitive damages: on Count I in an amount no less than $2,000,000; on Count II in an amount no less than $2,000,000; on Count III in an amount no less than $3,000,000, on Count IV in an amount no less than $4,000,000; on Count V in an amount no less than $2,000,130; on Count VI in an amount no less than $5,000,000

3. Order the defendant to be taxed with the cost of this action, including expert witness fees and reasonable attorney's fees for the plaintiff;

4. Retain jurisdiction over this action to assure compliance with the orders of this Court and with *42 U.S.C. Section 1981 and Tort laws;*

5. Plaintiff demands a jury trial for all issues of facts

This ____day of September, 2010

Magloire K. Placide Ayissi Etoh
131 Summit Hall Road
Gaithersburg, MD, 20877
Tel: 301-963-1972
Fax: 301-963 1972
placide_ac@yahoo.com
Plaintiff

CERTIFICATE OF SERVICE

I certify that on this September 1st , 2010, a true and correct copy of this Amended Complaint

and a copy of the original Compliant were served by a third party to the Attorneys of the

Defendants:

Damien Stewart
Madonna McGwin
Legal Department/Fannie Mae
3900 Wisconsin Avenue, N W
Washington, DC, 20016-2892
**Counsels for:**
Fannie Mae,
Michael J. Williams
Jacqueline K. Wagner
Thomas Cooper
Sanda Pesut

Magloire Placide Ayissi-Etoh, Plaintiff



RECEIVED

SEP    2010

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia