## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
**MAGLOIRE K. PLACIDE AYISSI ETOH,**                )
                                                    )
      **Plaintiff,**                               )
                                                    )
      **v.**                                       )     **Civil Action No. 10-1259 (ESH)**
                                                    )
**FANNIE MAE, *et al.*,**                           )
                                                    )
      **Defendants.**                              )
_____)

## <u>MEMORANDUM OPINION</u>

      Plaintiff Magliore K. Placide Ayissi Etoh, an African-American male and former employee of the Federal National Mortgage Association ("Fannie Mae"), brings this *pro se* action against Fannie Mae, Michael J. Williams, Fannie Mae's President and Chief Executive Officer ("CEO"), and three current or former Fannie Mae employees: Jacqueline K. Wagner, the former Chief Audit Executive, Thomas Cooper, a former Vice-President in the Internal Audit division, and Sanda Pesut, a Manager in the Internal Audit division (collectively "defendants"). His complaint includes federal claims for racial discrimination, racial harassment, and retaliation, all in violation of 42 U.S.C. § 1981, and state law claims for defamation and intentional or negligent infliction of emotional distress.  Before the Court is defendants' joint motion to dismiss or, in the alternative, for summary judgment.  For the reasons set forth herein, defendants' motion for summary judgment will be granted.

## BACKGROUND

### I.    FACTUAL BACKGROUND

      Plaintiff is a foreign-born black citizen of the United States, originally from Cameroon,

Africa.  (Compl. ¶ 7; Etoh Aff. ¶ 2.)  In February 2008, Fannie Mae called plaintiff to ask him to

interview for a position as a Senior Financial Modeler in the Internal Audit department.  (Etoh

Aff. ¶ 3.)  On March 3, 2008, the Director of the Modeling Team, then Philip Schlemmer,

interviewed plaintiff.  (Etoh Aff. ¶ 4.)  On March 12, 2008, plaintiff had a second interview with

Schlemmer and also interviewed with Pesut, who was then a Senior Auditor who reported to

Schlemmer, and two other members of the department.  (Etoh Aff. ¶ 4; Pesut Aff. ¶¶ 2-3.)  Pesut

recommended that plaintiff be hired even though he "did not have an audit background . . .

because of his experience and familiarity with financial models used in banking and mortgage

finance."  (Pesut Aff. ¶ 2).  Plaintiff was offered the job at an annual salary of $98,600, and he

started work on April 28, 2008.  (Etoh Aff. ¶¶ 5, 7; Defs.' Ex. 3[1]; Etoh Aff. ¶ 7.)  Between the

time plaintiff interviewed and started working at Fannie Mae, Wagner was hired as the Chief

Audit Executive to manage the Internal Audit department and Pesut was promoted to a Manager

position on the Internal Audit Modeling Team (still reporting to Schlemmer), making her

plaintiff's direct supervisor.  (Pesut Aff. ¶¶ 3, 4; Wagner Decl. ¶ 2; Etoh Aff. ¶ 16.)

### A.    Plaintiff's Employment as a Senior Financial Modeler

From March 2008 to June 2008, plaintiff worked in the Modeling Review Unit as a

Senior Financial Modeler and reported directly to Schlemmer.  (Garza Aff. ¶ 3; Etoh Aff. ¶¶ 7-

8.)  Schlemmer assigned plaintiff to work for Anna Garza, the Director of Internal Audit of

Single Family, on the Real Estate Owned Audit.  (Garza Aff. ¶¶ 2, 4.)  According to Garza,

plaintiff "performed well in this engagement"; he "received praises from [the Director of the

---

[1]Defendants used numbers to identify their exhibits and plaintiff used letters combined
with numbers.  For purposes of this Memorandum Opinion, exhibits to defendants' motion are
identified as "Defs.' Ex. __" and exhibits to defendants' reply are identified as "Defs.' Reply Ex.
__."  Plaintiff's exhibits are identified as "Pl.'s Ex. __."

Model Developer Unit] for his model review, his insight and suggestions for improvement of the models"; he "worked well with my staff and project team members"; he "worked overtime to get the workpapers completed early at [Garza's] request"; and he "was a team player and was eager to help the team." (Garza Aff. ¶¶ 5-8.) Schlemmer was pleased with plaintiff's work (Pl.'s Ex. B.1.8), and, at the end of the project, Garza submitted a reward request for plaintiff, which was approved by the Vice President of Internal Audit, Curtis Doss. (Garza Aff. ¶ 9; Etoh Aff. ¶¶ 9, 20; Pl.'s Exs. B.1.8, B.1.10.)

### B.    Restructuring of Internal Audit to Create Team Lead Positions

In July 2008, Wagner restructured the Internal Audit department. (Wagner Decl. ¶ 2; Pesut Aff. ¶ 4.) She laid off most of the Internal Audit Management Team, including Garza. (Garza Aff. ¶ 11.) She brought in Cooper, then an Ernst and Young employee, on a contract basis to run the Capital Markets, Finance and Modeling practice groups. (Defs.' Ex. 15; Etoh ¶ 21.) In addition, fourteen new "Team Lead" positions were created, each to be assigned a particular part of the business within the department. (Wagner Decl. ¶ 5; Pesut Aff. ¶ 5; Etoh Aff. ¶ 19.) Each Team Lead was to be "responsible for ensuring that audits were completed accurately and on time through diligent planning on the scope of an audit, efficient execution of the audit work and managing the audit staff assigned to the project." (Wagner Decl. ¶ 5.)

### C.    Team Lead Selection Process

According to Wagner, her goal was to "promote qualified candidates who demonstrated 'executive presence,' i.e. an ability to communicate with business leaders effectively, demonstrate business knowledge and show an ability to identify emerging business risks, and to take ownership of projects." (Wagner Decl. ¶ 8.) In addition, she sought only "domestic workers" to avoid the expense and uncertain success of H1-B sponsorship. (Wagner Decl. ¶ 9.)

According to plaintiff, the term "executive presence" was "a code [Wagner] used to avoid saying white or talks like whites."  (Etoh Aff. ¶¶ 14, 23.)

Generally, Fannie Mae employees are not permitted to apply for other positions within the company until they have completed twelve months with the company, but for the newly created Team Lead positions that restriction was lifted.  (Wagner Decl. ¶ 6; Defs.' Ex. 1 (Fannie Mae Internal Staffing Policy); Pesut Aff. ¶ 6.)  Two employees applied for the position of "Modeling Team Lead" – plaintiff and a white female, Karla Kucerkova, who was a Senior Auditor.  (Wagner Decl. ¶ 6; Pesut Aff. ¶ 6.)  Kucerkova had more auditing experience than plaintiff; plaintiff had a stronger educational background and more experience with financial models.  (Wagner Decl. ¶ 7.)  Pesut interviewed both candidates.  (Pesut Aff. ¶ 7.)  She "did not believe either candidate was well-suited for the job," but she rated Kucerkova slightly higher than plaintiff because "she was more familiar with audit practices and procedures."  (Pesut Aff. ¶ 7.)  A panel reviewing the applicants recommended plaintiff "primarily due to his educational background."  ( Pesut Aff. ¶ 7; Wagner Decl. ¶ 7.)  Pesut then supported the panel's decision and recommended plaintiff for the position.  (Pesut Aff. ¶ 7.)  Wagner accepted the panel's recommendation and, on July 30, 2008, offered plaintiff the position of "Auditor Team Lead" for the Modeling Team with a transfer date of August 17, 2008.  (Wagner Decl. ¶ 7; Defs.' Ex. 2.)  In all, twelve[2] individuals were promoted to Team Lead positions.  (Wagner Decl. ¶ 8.)  Of the twelve, six were African-American, three were Asian, two were White and one was Hispanic.  (Defs.' Ex. 3.)  Prior to promotion, ten had been "Senior Auditors"; one had been a Financial Analyst, Julie Kley; and one, plaintiff, had been a "Senior Financial Modeler."  (Defs.' Ex. 3.)

---

[2]It is not apparent from the record why only 12 of the 14 Team Lead positions were filled.

### D.     Team Lead Salaries

Of the twelve individuals promoted to Auditor Team Lead positions, only plaintiff was not given a salary increase.  (Defs.' Exs. 2, 3.)  According to the Director of Compensation, Nicole Harris Westbrook, who is African-American, Wagner "consulted with [her] department on recommendations for salary increases for these promotions."  (Westbrook Aff. ¶ 5.)  Initially, Wagner proposed giving each new Team Lead a 2% increase in salary.  (Wagner Decl. ¶ 10; Westbrook Aff. ¶ 5.)  However, after reviewing Wagner's proposal, the Compensation department suggested alternatives (Westbrook Aff. ¶ 6) in order "to ensure a meaningful increase is given," which was "defined as an increase of 5% or above."  (Defs.' Ex. 3, at 2 (e-mail from Jim Deng,[3] Compensation department, to Darlene Slaughter, Human Resources Director, and Kimberly Chavez, Human Resources department, with a copy to Nicole Harris[4]); *see also* Wagner Decl. ¶ 11 ("representatives from the Fannie Mae[] Compensation Team advised me that a 2% increase would not be meaningful and that I should consider a minimum 4-5% salary increase").)

As to plaintiff, the Compensation department

recommended *not* to provide [him] with a salary increase because he had recently joined the Company and his salary was well within range of the other newly promoted Team Leads.  Moreover, [his] then current salary was commensurate with the complexity of the position that he held and his experience as an auditor.

(Westbrook Aff. ¶ 6; *see* Wagner Decl. ¶ 11.)  Wagner accepted the recommendation of the

---

[3]In both the Wagner and Westbrook declarations, the year of Deng's e-mail is given as 2009, not 2008.  Contrary to plaintiff's suggestion (Pl.'s Facts ¶ 12), 2009 is clearly a typo, not evidence of defendants' deception and lies.

[4]Nicole Harris Westbrook was known by the name Nicole Harris at the time these events took place.

5

Compensation department and did not raise plaintiff's salary (Westbrook Aff. ¶ 7; Wagner Decl. ¶ 11), because "he had recently joined the Company," "his salary was within range of the other newly promoted Team Leads," and his "salary was commensurate with the complexity of the position he held and his minimum experience as an auditor."  (Wagner Decl. ¶ 11.)

The other Team Leads all received salary increases of varying percentages.  (Defs.' Ex. 3; Westbrook Aff. ¶ 7.)[5]  The largest increase went to Julie Kley, who was the only person besides plaintiff who had not previously been an auditor, although she had been employed by Fannie Mae since 2006; her salary was the lowest of the Team Leads, both before and after the increase.  The highest paid Team Lead was Hispanic, and the second and third highest paid Team Leads were African American.  (Defs.' Ex. 3; Westbrook Aff. ¶ 7.)  Before the promotions and salary increases for the other Team Leads, plaintiff had the sixth highest salary; after the promotions, plaintiff had the second lowest salary, although it was very close (only $1,400 less)

---

[5]Set forth below is a chart showing the salary for each Team Lead before and after promotion (with the relative ranking in parentheses after the amount), the % change in the salary, and the employee's race.  (Defs.' Ex. 3, at 1.)

| Name | Previous Salary | Team Lead Salary | % Change | Race |
| --- | --- | --- | --- | --- |
| Maribel Garrido-Pagan | 112,805 (1) | 117,316.84 (1) | 4% | Hispanic |
| Haddis Tafari | 109,200 (2) | 115,000 (2) | (5.3%) | Black |
| Demetria Paige | 107,951 (3) | 113,000 (3) | (4.7%) | Black |
| Naveen Fernandes | 105,000 (4) | 110,000 (4) | (4.8%) | Asian |
| Xing Li | 100,178 (5) | 105,000 (5) | (4.8%) | Asian |
| **Plaintiff** | **98,600 (6)** | **98,600 (11)** | **(0%)** | **Black** |
| Alisa Davis | 97,906 (7) | 103,000 (6) | (5.2%) | Black |
| Animesh Mathur | 94,159 (8) | 100,000 (7) | (6.2%) | Asian |
| Akosua Ofori | 94,155 (9) | 100,000 (7) | (6.2%) | Black |
| Oluwatoyin Adams | 94,155 (9) | 100,000 (7) | (6.2%) | Black |
| Olga Lukashevsky | 91,520 (11) | 100,000 (7) | (9.3%) | White |
| Julie Kley | 82,748 (12) | 92,000 (12) | (11.2%) | White |

than the three Team Leads ahead of him in the salary rankings.  (Defs.' Ex. 3.)  Other than

plaintiff, the relative rankings among Team Leads based on salary did not change.  (Defs.' Ex.

3.)  Naveen Fernandes was the only Team Lead who was, like plaintiff, new to Fannie Mae, but

he had ten years of prior audit experience.  (Defs.' Reply Ex. 2.)  Kucerkova, who had been

plaintiff's competition for the position of Modeling Team Lead, received a 2% salary increase,

raising her salary from $85,000 to $86,700.  Oluwaseyi Awoga, a black employee who was not

selected as a Team Lead, did not get a pay raise.  (Awoga Decl. ¶ 17.)

    **E.**    **Plaintiff's Performance in the Modeling Team Lead Position
(August - September 2008)**

Soon after plaintiff became the Modeling Team Lead, Pesut began to have "concerns"

about his "performance."  (Pesut Aff. ¶ 8.)  According to her affidavit, "his testwork

documentation was incomplete, he did not support audit conclusions, and his writing was

unclear."  (Pesut Aff. ¶8.)  She also "received reports that he was inattentive in meetings and fell

asleep during an auditor orientation session."  (Pesut Aff. ¶8.)  At some point, Pesut conveyed

her concerns to her "supervisor," Cooper.  (Pesut Aff. ¶8.)

Wagner was first advised in late September 2008 that plaintiff was "experiencing

performance problems in the Team Lead role."  (Wagner Decl. ¶ 13.)  On September 23, 2008,

there was an Audit Leadership Team Meeting at which the possibility of terminating plaintiff

was discussed.  (Etoh Aff. ¶ 34.)  Wagner asked the management team to consult with Human

Resources.  (Wagner Decl. ¶ 13.)  Thereafter, on September 25, 2008, Wagner's Chief of Staff,

Craig Krimbill, sent an e-mail to Slaughter, the Human Resources Director, informing her that

"[plaintiff] is still in his six month probationary period and the leadership is leaning toward

exiting him out due to his performance," and asking if she "ha[d] time tomorrow to discuss . . .

7

so that I can convey the process to the rest of the ALT [Audit Leadership Team]."  (Defs.' Ex. 4,

at 2.)  Slaughter responded with an e-mail that said:

> Hopefully the manager has been keeping notes on what is and isn't happening, in
> terms of his performance and has communicated that he's not performing at an
> acceptable level.  When is the probation end date - let's not wait until close to the
> end.  I'll review the information with legal, once that's completed we can have a
> conversation with the employee.  We can talk tomorrow.

(Defs.' Ex. 4, at 1.)  Krimbill responded to Slaughter that "we'd have until Oct 27 – I agree we

do not want to delay until that point in time."  (Defs.' Ex. 4, at 1.)  Krimbill then forwarded his

e-mail exchange with Slaughter to Pesut and Cooper with the note: "can we discuss in the

morning?"  (Defs.' Ex. 4, at 1.)  According to Pesut, she understood Krimbill's email to her as a

suggestion from Slaughter that she "begin documenting [p]laintiff's performance deficiencies."

(Pesut Aff. ¶ 9; *see also* Wagner Decl. ¶ 13 (Slaughter "opined that there was not enough

information to make any decisions and that we should begin documenting any perceived

performance deficiencies").

On September 29, 2008, Pesut met with plaintiff to discuss what she describes as his

"performance shortcomings."  (Pesut Aff. ¶ 14 & n.4; Etoh Aff. ¶ 57.)  According to Pesut,

plaintiff "did not respond well to any criticism," "was easily angered, prone to raising his voice,"

and "accused [Pesut] of creating a poisonous environment" and "retaliating against him because

he was selected for the Team Lead position over Karla Kucerkova."  (Pesut Aff. ¶ 14.)  In

addition, plaintiff "complained about performing audit testwork, which he felt was a duty for

staff auditors" and told Pesut that "as a Team Lead his responsibilities were limited to planning

the audit and reviewing the testwork performed by the staff auditors."  (Pesut Aff. ¶ 15; Etoh

Aff. ¶ 57.)  Pesut "told [p]laintiff that as the Team Lead it was his responsibility to ensure that

the Modeling team's work on any audit was performed satisfactorily and in a timely manner"

and that "[i]f accomplishing that overall objective required him to perform testwork then he would be expected to do whatever necessary to compete the task."  (Pesut Aff. ¶ 15.)

### F.   Plaintiff's Work on the Single Family Underwriting and Quality Assurance Audit (September - October 2008)

During September 2008, plaintiff worked primarily on the Single Family Underwriting and Quality Assurance Audit ("Single Family Audit").  At that time, the department used a software program known as "TeamMate," "an audit management software system that allow[ed] personnel in the Internal Audit department to store and share documents, including audit workpapers."  (Geisbert Aff. ¶ 3.)  On September 29, 2008, Pesut reviewed plaintiff's workpapers on the TeamMate program, and she also looked at the stored information he had received from the customer.[6]  (Pesut Aff. ¶ 11.)

On October 1, 2008, Pesut sent an e-mail to Cooper with two attachments.  The first attachment was a one-page document that Pesut identified as one of plaintiff's workpapers from the TeamMate program; the second attachment was a copy of the customer's response to an earlier inquiry from plaintiff.  (Pesut Aff. ¶ 11; Defs.' Exs. 10, 11.)  The text of the first attachment was identical to part of the text in the second attachment.  (Defs.' Exs. 10, 11.) Pesut's e-mail to Cooper stated in its entirety:

Thomas,

see attached:

1.     email from customer - in a Word file attached to that email there is a list of all our procedures with some notes and answers - customer notes that she provided answers to

---

[6]According to Pesut, plaintiff informed her that his workpapers for the Single Family Audit were ready for her review.  (Pesut Aff. ¶ 11; Defs.' Exs. 9, 12.)  Plaintiff denies telling Pesut anything.  (Etoh Aff. ¶ 53.)  This factual dispute is not material.

> audit questions
>
> 2.      word file - one of the workpapers in TeamMate where reasonableness of data inputs is assessed - bulleted part is exactly the same as customer's response on page 2 => word file attached to the email above

this is SF Underwriting and Quality Assurance audit.

I am pretty much done with the first round workpaper review, but they will need some more work after this first round of review notes is addressed.

Let me know if you want to discuss.

(Defs.' Ex. 10.)  According to Pesut, she sent the e-mail to Cooper because "[f]rom my review of the documents [p]laintiff represented as his own work-product, it appeared that plaintiff copied the customer's response to our inquiries regarding the soundness of the variables used in the financial model and represented the work as his own."  (Pesut Aff. ¶ 11.)[7]

On October 8, 2008, plaintiff edited the workpapers for the Single Family Audit.  (Defs.' Exs. 9, 12; Pl.'s Ex. D.6.7.b.)  On October 10, 2008, Pesut had another meeting with plaintiff about his performance (Pesut Aff. ¶ 14 & n.4; Etoh Aff. ¶ 57) and a meeting with Wagner about plaintiff.  (Etoh Aff. ¶ 58; Wagner Decl. ¶ 14.)[8]

On October 14, 2008, Pesut "presented [p]laintiff with short form evaluations to document [her] concerns with his performance on two audits: Single Family Underwriting and Quality Assurance and Multifamily Model Review."  (Pesut Aff. ¶ 10; Defs.' Exs. 5, 6.)  In the

---

[7]Pesut never "characterized" plaintiff's work as "plagiarism."  (Pesut Aff. ¶ 12.)

[8]According to plaintiff, during Pesut's meeting with Wagner she accused him of "intellectual theft" based on the documents Pseut had attached to her e-mail to Cooper (Etoh Aff. ¶ 58); according to Wagner, she was advised that Pesut was "concerned" about the "quality" of plaintiff's "analysis in his workpapers on the Single Family Underwriting and Quality Assurance Audit.") (Wagner Decl. ¶ 14.)

first evaluation, Pesut wrote that plaintiff's "work is below expectations in several areas: modeling technical skills, and workpaper documentation."  (Defs.' Ex. 5, at 2.)  In the second evaluation, Pesut wrote that plaintiff's "work is below expectations in the following areas: modeling technical skills, workpaper documentation . . . and communication skills."  (Defs.' Ex. 6, at 2.)  In addition to a number of other criticisms, Pesut also noted in the first review that plaintiff "signed-off in the system on the related workpapers as his own work, and did not note that the responses were provided by the customer."  (Defs.' Ex. 5, at 2.)  Plaintiff's written objections to each evaluation stated that it was "not true" and "just the continuation of a vendetta."  (Defs.' Exs. 5, 6; Pesut Aff. ¶ 10.)

On October 15, 2008, plaintiff met with Wagner and learned that he was being denied a "retention bonus."  (Etoh Aff. ¶ 65.)

On October 16, 2008, Wagner again met with plaintiff and discussed Pesut's email to Cooper and the possibility that plaintiff had committed plagiarism.  (Etoh Aff. ¶ 66; Pl.'s Ex. B.1.5.)  She also explained that Pesut's e-mail was the reason she denied plaintiff a retention bonus.  (Etoh Aff. ¶ 66; Pl.'s Ex. B.1.5.)  Plaintiff told Wagner that he believed the document sent by Pesut was false and that the "audit trail" in TeamMate would establish that the "workpaper" of his in TeamMate was a 7-page document.  (Etoh Aff. ¶ 69.)

At some point, Wagner advised plaintiff that she would have his testwork reviewed by Cooper, who was "on-board to oversee assigned audit projects in the audit plan, review workpapers and audit reports to ensure the accuracy and reliability of the work performed, and to help the staff with technical audit issues."  (Wagner Decl. ¶ 15.)  Cooper conducted an independent review of plaintiff's documentation for the Single Family Audit.  He concluded, and informed Wagner, that plaintiff's papers were "illogically organized and incomplete," but found

no evidence of plagiarism.  (Wagner Aff. ¶ 16; Etoh Aff. ¶ 72.)      On October 31, 2008,

Wagner met with plaintiff and advised him of Cooper's findings.  (Wagner Decl. ¶ 17; Etoh Aff.

¶ 72; Pl.'s Ex. A.6.3.)  During that meeting, plaintiff also asked Wagner about a salary increase.

According to plaintiff, she refused to talk about it, saying to him: "for a young black man smart

like you, we are happy to have your expertise; I think I'm already paying you a lot of money."[9]

(Etoh Aff. ¶¶ 46, 73.)

###    G.    November - December 2008

Pesut completed plaintiff's 2008 performance evaluation in November 2008.  (Pesut Aff.

¶ 16.)  In that evaluation, she wrote that plaintiff "needs to improve his technical audit and

documentation skills and gain better knowledge of audit practices," his "test results and

conclusions were not always adequately documented and supported," his "workpapers often did

not address the objective of a particular audit procedure he was performing and did not show

analysis done as part of the testwork," and on "several instances . . . there was an insufficient

level of evidence to support the test results."  (Defs.' Ex. 12; Pesut Aff. ¶ 16.)  Pesut's evaluation

concluded that plaintiff

> should improve in the following areas: knowledge of audit skills and practices,
> knowledge of Fannie Mae business areas under audit, project management and
> leadership skills.  He has to work on his audit skills and writing style to
> significantly reduce the amount of time needed for review.  Furthermore, [he] has
> to be more proactive as Audit Team Lead in driving execution of audit projects.
> Finally, [he] has to improve his attention to detail and make sure that he reads
> relevant documentation thoroughly and completely.

(Defs.' Ex. 12; Pesut Aff. ¶ 16.)  According to plaintiff, from August 2008 to December 2008, he

had "a promotion in name but not in responsibilities" because he "continued to perform only

---

[9]Wagner denies making this statement.  (Wagner Decl. ¶ 17.)

staff-level tasks."  (Etoh Aff. ¶ 51.)

H.      **January - March 19, 2009**

On January 16, 2009, Cooper became a Fannie Mae "employee," with the title of Vice-President, Audit.  (Defs.' Ex. 15.)  As a result, the hierarchical structure of the Internal Audit Modeling Team was as follows: Cooper was the Vice-President in charge of Internal Audit Modeling Team; Pesut was the Manager of the Team and reported to Cooper; plaintiff was the Team Lead and reported directly to Pesut.  The team also included a Senior Auditor and Auditor, both of whom reported to Pesut.

On March 5, 2009, Pesut met with plaintiff to go over his 2008 annual performance review, which in final form included plaintiff's responses to her comments.  (Pesut Aff. ¶ 17; Defs.' Ex. 12.)  Pesut also presented plaintiff with a "development plan."  (Pesut Aff. ¶ 17; Wagner Decl. ¶ 19; Defs.' Ex. 13.)  Pesut's development plan identified the following as developmental goals for plaintiff: "(1) learn audit practices; (2) improve leadership and project management skills; (3) deepen knowledge about Fannie Mae business; and (4) improve writing skills."  (Pesut Aff. ¶ 17; Defs.' Ex. 13.)  On March 6, 2009, plaintiff responded to Pesut in writing, commenting that the year-end review was "unfair" and "just a continuous retaliation since I raised the issue of treatment that I was the victim back in October 2008," and "reject[ing]" the development plan.  (Defs.' Ex. 14; Pesut Aff. ¶ 17.)  That same day, plaintiff reported Wagner's "racial discrimination actions" to Fannie Mae's Compliance and Ethics department; then, on March 11, 2009, he filed a formal complaint against both Wagner and Pesut.  (Etoh Aff. ¶ 82; Pl.'s Ex. B.2.1; Pl.'s Ex. G.5.1.)

On March 16, 2009, there was a meeting of all the team leads during which plaintiff learned that he was the only one still doing "testwork."  (Etoh Aff. ¶ 83.)  On March 17, 2009,

plaintiff met with Pesut and "raised" the testwork issue.  (Etoh Aff. ¶ 84.)  On March 18, 2009,

there was a Modeling Team meeting, during which plaintiff told Pesut that he "should no longer

be doing testwork."  (Etoh Aff. ¶ 85; Pl.'s B.2.2.)  After that meeting, Cooper sent plaintiff an e-

mail, asking him to "come see him" the following day.  (Etoh Aff. ¶ 86; Pl.'s Ex. B.2.1.)

### I.      Plaintiff's March 19, 2009 Meeting with Cooper

On March 19, 2009, plaintiff met with Cooper.  (Etoh Aff. ¶ 87; Pl.'s Ex. B.2.2.).[10]

According to plaintiff, Cooper ordered him to do test work and after plaintiff refused, Cooper

ordered him out of his office and then, when plaintiff did not immediately leave, yelled at

plaintiff "Get of out my office, Nigger."  (Etoh Aff. ¶¶ 90-95; Pl.'s Ex. B.2.2[11]; Defs.' Ex. 15.)

After plaintiff left Cooper's office, he e-mailed Pesut that he was "not feeling well right now"

and asked her "[c]an I go home please?"  (Pl.'s Ex. A.4.1; Etoh Aff. ¶ 96.)  Pesut gave him

permission to leave.  (Pl.'s Ex. A.4.1; Etoh Aff. ¶ 96.)  Plaintiff left and went to talk to the

Compliance and Ethics group about Cooper.  (Etoh Aff. ¶ 95; Pl.'s Ex. B.2.2.)  Later that same

day, plaintiff went to see a doctor, whose notes indicate that he "presents for headache that

started at 11am after being verbally assaulted by his boss."  (Pl.'s Ex. E.1.1; Etoh Aff. ¶¶ 96-97;

Defs.' Ex. 17, at 3.)  Plaintiff was treated for anxiety.  (Pl.'s Ex. E.1.1.)  The next day, March 20,

2009, plaintiff e-mailed Fannie Mae's then-President and Chief Executive Officer, Herb Allison,

---

[10]Plaintiff created a document he calls the "minute[s] of the March 19, 2009 Meeting between Thomas Cooper and [plaintiff]."  (Pl.'s Ex. B.2.2.)

[11]Defendants note that during the internal investigation Cooper denied uttering this epithet.  (Defs.' Facts ¶ 21 (citing Defs.' Ex. 15, at 13).  However, Fannie Mae's internal investigators concluded that "[a]lthough Mr. Cooper denied using the slur during the March 19, 2009 meeting," his denial was "not credible" and that "it is highly likely that he called [plaintiff] a 'nigger.'" (Defs.' Ex. 15, at 18.)  In any event, for summary judgment purposes the Court must assume all genuine disputes are resolved in plaintiff's favor.

to report Cooper's use of a "racial slur" and let him know that plaintiff found the situation "dehumanizing" and that his "experience in the audit department is more of a racial division and discrimination." (Etoh Aff. ¶ 98; Pl.'s Ex. B.2.1.)  Plaintiff continued to experience anxiety and sought treatment on several other occasions.[12] (Pl.'s Ex. E.1.1.)  Shortly after his meeting with Cooper, plaintiff filed a second complaint with Fannie Mae's Compliance and Ethics department against Wagner, Pesut and Cooper. (Defs.' Ex. 15.)

After plaintiff filed his second complaint, according to Pesut, he "became extremely difficult to manage." (Pesut Aff. ¶ 18.)  As Pesut describes it,

> [he] was dismissive of my comments of his work.  He was increasingly insubordinate in team meetings and openly challenged my decisions in front of the audit staff.  He acted as if there could be no recourse to his behavior – as if the commencement of an internal investigation insulated him from disciplinary action.  I received multiple complaints from the team about [p]laintiff's behavior concerning his dismissive tone, his failure to perform in a Team Lead capacity, and proving guidance on their work, which caused confusion.  Notably the other audit staff members reported to me that it was not clear if [p]laintiff had read all documentation necessary to gain an understanding of the business and area under audit.

(Pesut Aff. ¶ 18.)  For example, on April 23, 2009, Pesut asked plaintiff "to begin planning the Pricing Methodologies audit." (Pesut Aff. ¶ 19.)  She gave him the "business background which he could use" on May 18, 2009, but by May 27, 2009, he "still had not completed an initial draft . . . delaying the project by two and a half weeks." (Pesut Aff. ¶ 19.)  In the end, another team member, Sudha Sukumaran, took initiative and prepared the "scope analysis" for that project. (Pesut Aff. ¶ 19; Sukumaran Aff. ¶ 6; Defs.' Ex. 16.)

According to the auditors on plaintiff's team, plaintiff often "neglected his

---

[12]Plaintiff returned to the doctor on April 16, 2009, June 23, 2009, and August 5, 2009, for additional anxiety medication. (Pl.'s Ex. E.1.1.)

responsibilities" during the spring and summer of 2009.  (Kucerkova Aff. ¶ 4; Sukumaran Aff. ¶

4.)  In particular, he missed "walkthrough sessions with the business leaders – sessions designed

for the audit team to meet the business owners, to ask pertinent questions about the business, the

models in use, the variables that affect the models, and to seek other information that would be .

. . helpful to [the] analysis"; "he generally assigned the bulk of the preparation work to

[Kucerkova and her] teammate Sudha Sukumaran"; in April 2009, he "failed to draft a Scope

document"; he "was unprofessional towards Ms. Pesut" because [d]uring team meetings, he

challenged her authority by questioning the necessity of tasks, rolling his eyes, or audibly

sighing while she was speaking"; on one occasions he "adamantly refused to do any testwork,"

meaning that other team members, including Pesut, had to take care of that responsibility.

(Kucerkova Aff. ¶¶ 5-7; Sukumaran Aff. ¶¶ 5-7.)

### J.    Investigation of Plaintiff's Internal Complaints

The gist of plaintiff's two complaints to the Fannie Mae Compliance and Ethics

department (which were combined for investigation) was (1) that Wagner had denied him a

salary increase and a retention bonus because of his race and national origin (Wagner Decl. ¶ 19;

Defs.' Exs. 16, 17); (2) that Wagner had told him that as a "young Black man," he should be

satisfied with his compensation (Defs.' Exs. 15, 17); (3) that Pesut had retaliated against him

because she disagreed with his selection for Team Lead and had learned that he planned to raise

concerns about her managerial ability with the Chief Audit Executive (Wagner) by (a) falsely

accusing him of plagiarism; (b) giving him an unfair and biased short-form evaluations and

annual performance review; and (c) requiring him to perform testwork unlike other Team Leads

(Pesut Aff. ¶ 17; Defs.' Exs. 15, 17); and (4) that Cooper use of the racial epithet "nigger"

constituted racial discrimination and harassment.  Fannie Mae's Office of Investigations retained

external investigators to investigate plaintiff's two complaints.  (Pesut Aff. ¶ 17; Defs.' Ex. 15.)

On May 26, 2009, plaintiff e-mailed Fannie Mae's CEO (defendant Williams) to complain about

the "excessive delay" in resolving his "racial discrimination and racial slur cases."  (Pl.'s Ex.

B.2.1.)  Williams responded that same day that "the length of the investigative process will vary

depending upon the nature and extent of activity required," that "the investigation should be

concluded within the next two weeks," and that he had shared plaintiff's e-mail with the person

"responsible for supervising all investigations."  (Pl.'s Ex. B.2.1.)

On June 15, 2009, the external investigators issued their report (Defs.' Ex. 15.)  The

report found no merit to plaintiff's claims of racial discrimination by Wagner, discrimination or

retaliation by Pesut, and that he should not have to perform testwork.  (Defs.' Exs. 15.)  The

report faulted Pesut for "poor management, inexperience, and a lack of judgment" and faulted

plaintiff for his "difficult and challenging personality."  (Defs.' Exs. 15.)  With respect to

Cooper, the report found that he "harassed and demonstrated racial bias against [plaintiff] by

calling [plaintiff], who is African-American, a 'nigger' while demanding that [plaintiff] leave his

office following a heated discussion regarding [plaintiff's job responsibilities]."  (Defs.' Ex. 15,

at 3.)  That same day, Fannie Mae issued an "Investigations Decision" adopting the report's

findings.  (Defs.' Ex. 17;  Pl.'s Ex. S.1.11.)  With respect to Cooper, the decision concluded that:

> Internal Audit vice president Thomas Cooper violated the EEO/Non-
> Discrimination policy, the Prevention of Harassing Behavior policy, and the Code
> by directing a racial epithet at an employee.  Investigations also found that Mr.
> Cooper violated the Contractors' Code of Conduct, as well as the Contractor Use
> and Conflicts of Interest policies, by making personnel decisions, and approving
> the retention of Ernst & Young ("E&Y") contractors, while he was working as an
> E&Y contractor at Fannie Mae.  Finally, Investigations found that Mr. Cooper
> violated the Standards of Professional Behavior policy by raising his voice and
> demanding that an employee leave his office, and by publicly criticizing
> employees during meetings.

> In light of these findings, and in consultation with your Human Resources
> representative and Employment Practices Group attorney, please immediately
> terminate Mr. Cooper's employment.

(Pl.'s Ex. S.1.11; Defs.' Ex. 17 (redacted version).)  Fannie Mae terminated Cooper that same

day.  (Defs.' Facts ¶ 22.)

### K.    June - August 2009

According to plaintiff, he "started the process of filing [c]laims of discrimination with the

EEOC [Equal Employment Opportunity Commission]" in late June 2009.  (Etoh Aff. ¶ 107.)[13] In

mid-July, Wagner left Fannie Mae.  (Wagner Decl. ¶ 21.)  Also in July, Sukumaran transferred

to a new position within Fannie Mae because she "was so frustrated with [p]laintiff's behavior."

(Sukumaran Aff. ¶ 9.)

On August 3, 2009, plaintiff was interviewed by phone by EEOC representatives for over

an hour.  (Etoh Aff. ¶ 107.)  After the call ended and plaintiff returned to his desk, Pesut asked

where he had been.  (Etoh Aff. ¶ 108.)  Plaintiff told her that he had been "on the phone with

EEOC agents" because he had filed claims against Pesut, Wagner and Cooper.[14]  (Etoh Aff. ¶

108.)

On August 6, 2009, Pesut met with plaintiff to give him his "2009 Mid-Year Review."

(Pesut Aff. ¶ 21; Defs.' Ex. 18.)  That meeting was attended by a representative from Human

Resources, Marian Stevens.  (Pesut Aff. ¶ 22.)  Pesut rated plaintiff "off-track against the

department goals for team leads and his development goals."  (Pesut Aff. ¶ 21; Defs.' Ex. 18.)

---

[13]On July 3, 2009, plaintiff invoked his right to arbitrate various constitutional and
statutory claims against Fannie Mae pursuant to Fannie Mae's Dispute Resolution Policy.
(Defs.' Facts ¶ 40.)

[14]Pesut denies that plaintiff told her about his EEOC complaint.  (Pesut Aff. ¶ 33).

In her summary, Pesut identified plaintiff's "project management skills" and "writing skills" in particular as needing improvement.  (Defs.' Ex. 18, at 4.)  She also wrote that he needed to "be more open to feedback" and to "treat people with respect regardless of level."  (Defs.' Ex. 8, at 4.)  Plaintiff's written response, which is incorporated in the review, stated that the review was "simply retaliation: a planned dismissal of my person from the company because I filed a complaint [of] racial discrimination and harassment against my Upper Management.  This is not an evaluation; this is an execution of a calculated, relentless effort to terminate my employment."  (Defs.' Ex. 18, at 6.)

During the meeting, Pesut also gave plaintiff a Written Warning for Unsatisfactory Job Performance, based on his "insufficient leadership and project management during audit execution," the need for "significant rework" of his "audit risk control assessments," the "timeliness of tasks [plaintiff] needed to perform," the need for "significant revisions . . . for draft audit reports," and "defensiveness in communication with [Pesut]."  (Defs.' Ex. 19; Pesut Aff. ¶ 22; Etoh Aff. ¶ 109.)  Plaintiff "was advised that if he did not improve in these areas that he could be subject to further disciplinary action up to and including termination."  (Pesut Aff. ¶ 22; Defs.' Ex. 19.)  According to Pesut, "[p]laintiff chuckled throughout the meeting."  (Pesut Aff. ¶ 22.)

The next day, August 7, 2009, plaintiff filed a formal "Charge of Discrimination" with the Equal Employment Opportunity Commission.  (Defs.' Ex. 31; Etoh Aff. ¶ 110.)  The charge asserted that plaintiff had been discriminated against based on his race and national origin when he was denied a salary increase upon his promotion to Team Lead in July 2008 and again in October 2008; that Pesut created a "hostile work environment" with her accusation of plagiarism and other actions designed to push him out of the company; and that he had been retaliated

against by Wagner and Pesut for filing a complaint with Fannie Mae's Compliance and Ethics department.  (Defs.' Ex. 31.)

On August 11, 2009, plaintiff e-mailed his comments on his mid-year evaluation to Stevens and Chavez in the Human Resources department.  (Pl.'s Ex. D.5.5.)  In that e-mail, he repeated his view that his evaluation was "simply retaliation: a planned dismissal of my person from the company because I filed a complaint [of] racial discrimination and harassment against my Upper Management."  (Pl.'s Ex. D.5.5.)  Stevens responded that "due to the nature of [his] response," she "forwarded [his] e-mail to Fannie Mae's Investigations group."  (Pl.'s Ex. D.5.5.)

On August 20, 2009, the EEOC sent a Notice of Charge of Discrimination to Fannie Mae's General Counsel, Madonna McGwinn.  (Pl.'s Ex. S.1.5.)  Fannie Mae was ordered to respond by September 21, 2009.  (Pl.'s Ex. S.1.5.)  No response was filed.

### L.      September - October 2009

Pesut's relationship with plaintiff continued to deteriorate.  (Pesut Aff. ¶¶ 25-29.)  For example, on September 4, 2009, she sent him an e-mail asking him to do several things, including "create procedures for this part of the testwork."  (Defs.' Ex. 21.)  Plaintiff's e-mailed response was ""[t]he other request about testwork will not be done by me.  As you recall, I DO NOT DO TESTWORK as a Team Lead."  We have been through a whole investigation and you are now trying to sneak the testwork on me by a backdoor."  (Defs.' Ex. 21.)  Pesut forwarded her e-mail exchange to Stevens and Chavez.  (Defs.' Ex. 21.)  At some point, Kurcerkova told Pesut that she believed that plaintiff's "behavior and poor management style[] was adversely impacting [the teams'] overall performance."  (Kucerkova Aff. ¶ 9.)

On September 17, 2009, Pesut sent an e-mail to plaintiff asking him to address the "coaching notes" she had left for him after reviewing his workpapers.  (Defs.' Ex. 22.)

20

Plaintiff's response was to ask Pesut to "be a little less sloppy in your work" and "give me a precision about what these instructions refer to." (Defs.' Ex. 22.) Pesut sent a clarifying e-mail, to which plaintiff responded: "Your work needs to be up to par, your e-mail was sub-par." (Defs.' Ex. 22.) Pesut forwarded this exchange to Stevens. (Defs.' Ex. 22.)

Also on September 17, 2009, Pesut had a status meeting with the Interest Rate Risk Management team "to discuss status of testwork on the project." (Defs.' Ex. 23.) According to Pesut's post-meeting memo to the file, Pesut "asked [plaintiff] to review walkthroughs and flowcharts by [the] end of the week." (Defs.' Ex. 23; Kucerkova Aff. ¶ 8.) Plaintiff questioned the deadline in front of all the team members. (Defs.' Ex. 23.) As described by Kucerkova, plaintiff became "confrontational and defensive" about Pesut's timeline for completing the task. (Kucerkova Aff. ¶ 8.) On September 22, 2009, plaintiff claims that Pesut gave him a choice between foregoing his claims against Fannie Mae or being fired. (Etoh Aff. ¶ 111.) Pesut denies this. (Pesut Aff. ¶ 33.)

On September 29, 2009, Pesut met with plaintiff. (Defs.' Ex. 24.) In a "follow-up" e-mail sent on September 30, Pesut asked plaintiff "to confirm [her] understanding of the things [plaintiff] told [her]":

> *you refuse to produce bi-weekly status report on your work for 1:1 meetings as I asked you to
>
> *you do not intend to create the report for the 1:1 meetings going forward
>
> I want to reiterate my expectation that you will continue to prepare the status report on your work for your 1:1 meetings.

(Defs.' Ex. 24.) A subsequent e-mail exchange established that plaintiff thought Pesut was seeking 8-12 status reports per month and that Pesut disagreed with plaintiff's interpretation of her request. (Defs.' Ex. 24.)

On October 9, 2009, Pesut sent plaintiff an e-mail asking for his "help with the Model Life Cycle review" and asking for a response by the end of the day on October 12. (Defs.' Ex. 26.) Plaintiff responded that "I will no[t] be able to help you with the request below. I have my own deliverable due on Monday. . . . You should give it to Karla or Adnan." (Defs.' Ex. 26.) Pesut's reply asked plaintiff to complete her request by October 13. (Defs.' Ex. 26.) Plaintiff responded "I am busy, give it to someone else." (Defs.' Ex. 26.)

### M.     Termination

After Pesut forwarded the October 9, 2009 e-mail exchange to Stevens, Stevens advised her to "add this to the end of the termination memo." (Defs.' Ex. 26.) That same day, Pesut finalized her "termination" memorandum, addressed to Patricia Black, the Vice President of Internal Audit and to Stevens." (Defs.' Ex. 27.) Pesut requested to terminate [plaintiff's] employment based on . . . [c]ontinued performance issues [and] . . . [i]nsubordination." (Defs.' Ex. 27.) The memorandum was several pages long and described a number of examples in each category. (Defs.' Ex. 27.) Pesut then met with Human Resources and received permission to terminate plaintiff based on continued performance issues and insubordination. (Pesut Aff. ¶ 30; Defs.' Ex. 27.)

On October 12, 2009, Pesut verbally and then in an e-mail told plaintiff that she wanted to meet with him that afternoon. (Pesut Aff. ¶ 31; Defs.' Ex. 28.) At that meeting, which was attended by Stevens, Pesut told plaintiff that he was terminated and Stevens presented plaintiff with a final paycheck. (Pesut Aff. ¶¶ 32; Defs.' Ex. 29.)

### N.     Plaintiff's Final Check

Plaintiff's final check turned out to be invalid, which plaintiff discovered after several attempts to cash or deposit it. (Pl.'s Exs. B.2.9, B.2.6.a; Etoh Aff. ¶¶ 113-120.) After his first

attempt failed, plaintiff contacted the Human Resources department, but was told that the check was valid.  (Etoh Aff. ¶ 115.)  After his second attempt failed, plaintiff sent Williams a "Notice of Dishonored Check."  (Etoh Aff. ¶ 116; Pl.'s Exs. B.2.6.a, B.2.6.b, B.2.7.)  Williams notified Damien Steward, Fannie Mae's counsel, who e-mailed plaintiff that the check was valid and could be cashed at any Bank of America branch.  (Etoh Aff. ¶ 117.)  Plaintiff tried again on October 29, 2011, to cash the check.  According to plaintiff, the bank clerk advised him that trying to cash a phony check can lead to prison.  (Etoh Aff. ¶ 119.)  On October 30, 2009, plaintiff notified Williams that he was still unable to cash the check.  (Etoh Aff. ¶ 120.)  Fannie Mae issued a new check on October 30, 2009 (Defs.' Ex. 30; Bernier Decl. ¶ 8), which plaintiff cashed.  (Bernier Decl. ¶ 8.)[15]  According to Jennifer S. Bernier, the General Accounting Manager in the Finance Division of Fannie Mae, Stevens had requested the preparation of a final check for plaintiff on October 12, 2009.  (Bernier Decl. ¶ 3.)  That day, however, "the Accounts Payable associate who normally print[ed] payroll checks was out of the office."  (Bernier Decl. ¶ 6.)  Another staff member printed the check, but, due to certain "internal control practices," although the check appeared valid, it was not.  (Bernier Decl. ¶¶ 5-7.)

### O.    EEOC Proceedings Post-Termination

On July 21, 2010, Fannie Mae's counsel submitted the final decision of the Arbitrator  to the EEOC "in lieu of a Statement of Position."[16]  (Pl.'s Exs. S.1.6.b, S.1.7.)  The next day, in an e-mail to the EEOC, Fannie Mae's counsel stated "I would reiterate that this office does not have

---

[15]Plaintiff challenges the veracity of everything in Bernier's declaration (Etoh Aff. ¶¶ 125-130), but offers no evidence to contradict it.

[16]The claims plaintiff raised in arbitration, *see supra* n.13 were tried before an arbitrator on April 19-22, 2010.  On June 2, 2010, the arbitrator dismissed all claims against Fannie Mae. (Pesut Aff. ¶ 34; Defs.' Ex. 32.)

record of receiving the Charge in this matter.  More importantly, the managers and supervisors

of Mr. Ayissi-Etoh had no knowledge that he had filed anything other than an internal charge of

discrimination and retaliation."  (Pl.'s Ex. S.1.6.b.)  On April 28, 2011, the EEOC dismissed

plaintiff's charge on the ground that it was "unable to conclude that the information obtained

establishes violations of the statutes.  This does not certify that respondent is in compliance with

the statutes.  No finding is made as to any other issues that might be construed as having been

raised by this charge."  (Defs.' Notice of Supp. Auth., July 18, 2011.)

## II.    PROCEDURAL BACKGROUND

Plaintiff filed the above-captioned case on July 27, 2010.  Plaintiff's amended complaint

includes the following claims: (1) a claim for  racial discrimination in violation of 42 U.S.C. §

1981 against defendants Fannie Mae and Wagner based on the fact that he was not given a salary

increase at the time of his promotion to Team Lead (Count I); (2) a claim for defamation against

defendant Pesut based on her October 2008 e-mail to Cooper concerning plaintiff's work product

for the Single Family Audit (Count II); (3) a claim for hostile work environment in violation of

42 U.S.C. § 1981 based on Cooper's use of the racial epithet "nigger" directed to plaintiff during

their March 2009 meeting and Fannie Mae's failure to terminate Cooper until three months later

(Count III); (4) a claim for intentional or negligent infliction of emotional distress against

Cooper based on his use of a racial epithet during the March 2009 meeting with plaintiff (Count

IV); (5) a claim for retaliation in violation of 42 U.S.C. § 1981 against Fannie Mae alleging that

plaintiff was terminated in October 2009 in retaliation for filing a charge of discrimination with

the EEOC in August 2009 (Count V); and (6) a claim for intentional or negligent infliction of

emotional distress against Fannie Mae based on its issuance of a bad final check to plaintiff and

the events that transpired when plaintiff tried to cash that check (Count VI).  Defendants seek

summary judgment on each of plaintiffs' claims.[17]

## ANALYSIS

I.      **SUMMARY JUDGMENT STANDARD**

Summary judgment is warranted when the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)-(c).  The mere existence of a factual dispute does not preclude summary judgment; "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A fact is material if, under the substantive law applicable to the case, it is capable of affecting the outcome of the litigation.  *Id.*  A dispute is a "genuine" for summary judgment purposes if the "evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Doe v. Dep't of the Treasury*, 706 F. Supp. 2d 1, 5 (D.D.C. 2009) (citing *Anderson*, 477 U.S. at 248).

In seeking summary judgment, the moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once this burden has been met, the non-moving party must "go beyond the pleadings and by [her] own affidavits, or by [the evidence in the record] designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324

---

[17]Although defendants style their motion as one to dismiss or for summary judgment, all of the arguments rely on matters outside of the pleadings and therefore are properly treated as arguments for summary judgment.

(quotations omitted).  The non-moving party's opposition "must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial." *Doe*, 706 F. Supp. 2d at 5; *see also Freedman v. MCI Telecomm. Corp.*, 255 F.3d 840, 845 (D.C. Cir. 2001) (plaintiff must have more than "a scintilla of evidence to support [her] claims").  In other words, the non-moving party is required to point to evidence that would permit a reasonable jury to find in her favor.  *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  Additionally, because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inference from the facts are jury functions, not those of a judge," the "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  *Anderson*, 477 U.S. at 255.

## II.     COUNTS I, III, and V – CLAIMS UNDER 42 U.S.C. § 1981

Plaintiff alleges three distinct claims under 42 U.S.C. § 1981[18]: (1) a claim of racial

---

[18]Section 1981 provides:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

discrimination due to the fact that he was not given a salary increase when he was promoted to

Team Lead (Count I); (2) a claim of racial harassment based on a hostile work environment

(Count III); and (3) a claim of retaliation based on the fact that he was terminated from Fannie

Mae after he filed a complaint with the EEOC (Count V).

### A.      Racial Discrimination Based on Denial of Salary Increase (Count I)

Plaintiff claims that the decision not to give him a salary increase when he was promoted

to Team Lead amounted to racial discrimination in violation of § 1981.

Despite differences in statutory language between § 1981 and Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*.,  it is well-established that courts analyze

discrimination claims under § 1981 using the same *McDonnell Douglas* burden-shifting

framework as in a Title VII cases.  *See Sparrow v. United Air Lines, Inc*., 216 F.3d 1111, 1114

n.3 (D.C. Cir. 2000) (citing *Carney v. Am. Univ.*, 151 F.3d 1090, 1092-93 (D.C. Cir. 1998)(citing

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973))); *Carter v. George Washington Univ.*,

387 F.3d 872, 878 (D.C. Cir. 2004).  Under this approach, plaintiff must first establish a prima

facie case of racial discrimination, "by showing that '(1) [he] is a member of a protected class;

(2) [he] suffered an adverse employment action; and (3) the unfavorable action gives rise to an

inference of discrimination.'"  *Royall v. Nat'l Ass'n of Letter Carriers*, 548 F.3d 137, 144 (D.C.

Cir. 2008) (quoting *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006)).

"The burden of production then shifts to the employer to articulate a 'legitimate,

---

(c) Protection against impairment

The rights protected by this section are protected against impairment by
nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

nondiscriminatory' justification for the adverse employment action." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). Once an employer offers a legitimate non-discriminatory reason for its action, "the *McDonnell Douglas* burden-shifting framework effectively evaporate[s]"and "the sole remaining question" becomes "whether, based on all the evidence, a reasonable jury could conclude that [defendants'] proffered reason for the [action] was pretext for [discrimination]." *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 603-04 (D.C. Cir. 2010) (internal quotations omitted); *see Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009); *see also Royall*, 548 F.3d at 144 ("Where an employer offers 'clear and reasonably specific' nondiscriminatory reasons for the adverse  employment action, . . . the burden of production shifts back to the plaintiff, 'the *McDonnell Douglas* framework falls away, and [the court] must determine whether a reasonable jury could infer discrimination based on the prima facie case, the plaintiff's challenge to the employer's proffered justification, and any other evidence of discrimination." (internal citations and quotations omitted)); *Vickers v. Powell*, 493 F.3d 186, 195 (D.C. Cir. 2007)).[19]

Defendants have proffered legitimate, non-discriminatory reasons for not increasing plaintiff's salary upon his promotion to Team Lead. According to defendants, Wagner's initial intent was to give plaintiff a salary increase, but the Human Resources Compensation department advised against it because of plaintiff's short tenure with the company, his lack of

---

[19]Plaintiff has clearly established, and defendants do not argue to the contrary, the first two elements of a prima facie case of discrimination. Defendants' argument that plaintiff's claim fails because he has not established the third prong of a prima facie case for discrimination, specifically that the circumstances surrounding the challenged action give rise to an inference of discrimination, need not be addressed. *See George v. Leavitt*, 407 F.3d 405, 411 (D.C. Cir. 2005) (once the employer offer nondiscriminatory reasons for the action, the court "need not decide whether the plaintiff has made out a prima facie case, and may 'proceed[s] to the ultimate question of discrimination vel non"); *see also U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983).

prior experience as an auditor, and the fact that plaintiff's salary was already within the range of comparable Team Leads.  Thus, the "sole remaining question" for the Court is whether a reasonable jury could conclude that the proffered reason was pretext for discrimination.  *See, e.g.*, *Pardo-Kronemann,* 601 F.3d at 603-04.  That is, does the "evidence create[] a genuine dispute on the ultimate issue of [discrimination] either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* at 604 (internal quotations omitted)).

"A plaintiff . . . may show pretext in a number of ways, including by offering evidence of more favorable treatment of similarly situated persons who are not members of the protected class or that the employer is lying about the proffered justification." *Royall*, 548 F.3d at 144 (citing *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008)).  "Under the latter approach, '[i]f the employer's stated belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts.'" *Id.* (quoting *Brady*, 520 F.3d at 495); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

Plaintiff points to the following as evidence "that similarly situated employees of a different race received more favorable treatment," *Royall*, 548 F.3d at 145: (1) two other new Internal Audit employees who were promoted to Team Leads, both "non-black," one white and one Indian-American (Kley and Fernandes), did receive salary increases; (2) non-black employees with salaries higher than plaintiff received salary increases, even though their salaries were "within the range"; (3) the white employee over whom he was selected for Team Lead was given a salary increase to "recognize her contributions" and to "prevent her from becoming

discouraged" over losing the job to plaintiff; and (4) a black employee who was not selected as a Team Lead was not given a salary increase.  (Pl.'s Mem. at 11-12.)  Plaintiff also relies on Wagner's comment to plaintiff in October 2008 as evidence that she acted with discriminatory intent.

The evidence cited by plaintiff is insufficient to establish pretext given other undisputed facts that plaintiff fails to address.  Most significantly, excepting plaintiff, all of the new Team Leads received salary increases, including five African-Americans.  Thus, of the employees who were already "in the range," including several African-Americans (all except plaintiff) received salary increases.  Nor was plaintiff's race the only difference between him and the other "new" Internal Audit employees who received increases: Kley was not new to Fannie Mae, and her salary was significantly below plaintiff's even after the salary increase; Fernandes, although new to Fannie Mae, had ten years of audit experience prior to joining Fannie Mae.  Finally, the fact that Kucerkova received a salary increase while Awoga did not is not material as neither is similarly situated to plaintiff.

In addition to the weakness of plaintiff's evidence of pretext, there are a host of other other undisputed facts that negate any suggestion that Wagner's decision not to give plaintiff a salary increase was racially motivated.  Those facts include: (1) Wagner set the salaries for the twelve successful Team Lead candidates based on the advice of Human Resources Compensation personnel; (2) six of the twelve candidates Wagner selected for promotion were African-American;[20] (3) five of the six African-American candidates received salary increases,

_____

[20]Evidence that an employer hires many workers within the protected class is "relevant," but "not dispositive" of nondiscrimination."  *Reeves*, 530 U.S. at 153.

only plaintiff did not; (4) Wagner's initial intent was to give plaintiff a salary increase, but the Human Resources Compensation department advised against it because of plaintiff's short time with the company, his lack of prior experience as an auditor, and the fact that plaintiff's salary was withing the range of the other new Team Leads; (5) the Compensation Director, Westbrook, is also African-American; (6) among the Team Leads, a Hispanic woman had the highest salary, but two African-Americans had second and third highest salaries; (7) Wagner decided to promote plaintiff over a white applicant; and (8) even after the salary increases, plaintiff earned substantially more than Julie Kley, a white Team Lead.

Considering these undisputed facts and resolving all disputed facts and drawing all inferences in plaintiff's favor, a reasonable jury could not conclude that failing to give plaintiff a salary increase upon his promotion to Team Lead was an act of racial discrimination.  Plaintiff's view is that Wagner and Cooper were upset by his promotion over Kucerkova and retaliated by denying him a salary increase.  (Etoh Aff. ¶¶ 31-34.)  While that may be true, there is no reasonable basis upon which to infer that this was the result of a racial animus, as opposed to personal animus.  The strongest evidence that supports plaintiff's claim may be Wagner's comment in November 2008, but that single, isolated, after-the-fact comment, especially in light of the other evidence, is not enough to establish that defendants' legitimate, non-discriminatory reason was pretextual.  A reasonable jury viewing all the evidence could conclude that plaintiff was treated differently and arguably "worse" than everyone else who was selected as a Team Lead in July 2008 because his salary was not increased, but not that the salary decision by Wagner was the result of racial discrimination.  Accordingly, defendants are entitled to summary judgment on Count I.

**B.       Racial Harassment/Hostile Work Environment (Count III)**

Plaintiff claims that he was subjected to a racially hostile work environment in violation of 42 U.S.C. § 1981 due to Cooper's use of the racial epithet "nigger" during their March 19, 2009 meeting and the fact that three months passed before Fannie Mae completed its investigation of plaintiff's complaint and terminated Cooper.

To establish a prima facie case of hostile work environment plaintiff must demonstrate that: (1) he is a "member[] of a protected class"; (2) he was "subject to unwelcome harassment"; (3) "the harassment occurred because of his race"; (4) "the harassment affected a term, condition or privilege of employment"; and (5) "the employer knew or should have known of the harassment, but failed to take any action to prevent it." *Kelley v. Billington*, 370 F. Supp. 2d 151, 156 (D.D.C. 2005) (citing *Jones v. Billington*, 12 F. Supp. 2d 1, 11 (D.D.C. 1997), *aff'd*, 1998 WL 389101 (D.C. Cir. June 30, 1998)).  A "hostile work environment" exists only when the "'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).  In order to determine whether a work environment is sufficiently hostile to be actionable under § 1981, a court must consider: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or merely offensive; and (4) whether the conduct unreasonably interferes with the employee's performance.  *Faragher v. Boca Raton*, 524 U.S. 775, 787-88 (1998).  As the Supreme Court has explained:

> These standards for judging hostility are sufficiently demanding to ensure that
> Title VII does not become a general civility code.  Properly applied, this will
> filter out complaints attacking the ordinary tribulations of the workplace, such as

> the sporadic use of abusive language, gender-related jokes, and occasional
> teasing.

*Id*. at 788 (internal quotations omitted).  Rarely, if ever, can an isolated incident establish a

hostile working environment.  *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986)

("mere utterance of an ethnic or racial epithet which engenders offensive feelings in an

employee would not affect the conditions of employment to [a] sufficiently significant degree to

violate Title VII" (internal quotations omitted)); *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C.

Cir. 2002) ("a few isolated incidents of offensive conduct do not amount to actionable

harassment").

Given this "demanding" standard, it is clear that defendants are entitled to summary

judgment on plaintiff's hostile work environment claim.  As distasteful as Cooper's use of a

racial epithet to address plaintiff is, no reasonable jury could find a hostile work environment

claim based on that single utterance – even taking into consideration the fact that Cooper was

plaintiff's superior and the fact that the epithet was directly addressed to plaintiff.  *Cf. Harris v.

Wackenhut Servs., Inc*., 2011 WL 2118073, at *1-2 (D.C. Cir. 2011) (no hostile work

environment based on "three racially motivated comments directed at [plaintiff] during a

one-year period"); *Freedman v. MCI Telecommunications Corp.*, 255 F.3d 840, 848-49 (D.C.

Cir. 2001) (no hostile environment based on single statement of "religious slander"); *Bundy v.

Jackson*, 641 F.2d 934, 943 n.9 (D.C. Cir. 1981) ("casual or isolated manifestations of a

discriminatory environment, such as a few ethnic or racial slurs, may not raise a cause of

action"); *George v. Leavitt*, 407 F.3d 405, 416–17 (D.C. Cir. 2005) (no hostile work

environment based on statements by three employees over a six-month period telling plaintiff to

"go back where she came from," other distinct acts of yelling and hostility, and allegations that

plaintiff was singled out for undesirable work assignments); *Deloatch v. Harris Teeter, Inc.*, 2011 WL 2750941, at *10 (D.D.C. July 13, 2011) ("plaintiff's allegations – that his manager referred to him as a 'nigger' in one instance and that he overheard another manager call his co-worker the same racial epithet on another occasion – are not enough to rise to the level of severity and pervasiveness required to maintain a hostile work environment claim"); *Ramey v. Potomac Elec. Power Co.*, 468 F. Supp.2d 51, 58 (D.D.C. 2006) ("One incident – though reprehensible if true – does not a hostile work environment make."); *Kidane v. Northwest Airlines, Inc.*, 41 F. Supp. 2d 12, 16 (D.D.C. 1999) ("Though remarks such as these, if true, doubtless are discriminatory and inappropriate, such isolated remarks are not sufficient to state a claim of hostile work environment . . . .").

And although plaintiff takes issue with the length of the investigation and Fannie Mae's failure to isolate him from Cooper while it proceeded, he has not put forth any evidence that he was subjected to additional harassment from Cooper or anyone else during those three months. In addition, the end result of the investigation was that Cooper's employment was terminated. Under these circumstances, no reasonable juror could decide that defendants' conduct altered the conditions of plaintiff's employment and created an abusive working environment. Accordingly, defendants are entitled to summary judgment on Count III.

### C.    Retaliatory Discharge (Count V)

Plaintiff claims that he was unlawfully discharged in retaliation for filing a complaint with the EEOC in August 2009. The same *McDonnell Douglas* burden-shifting framework applies to claims of retaliation. *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010). To establish a prima facie case for retaliation, plaintiff must show "(1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a

causal link connects the two." *Jones v. Bernanke*, 557 F.3d at 677; *Holcomb v. Powell*, 433 F.3d 889, 901-02 (D.C. Cir. 2006). Once plaintiff makes out a prima facie case,[21] the burden shifts to the employer to "articulate some legitimate, nonretaliatory reason for its action." *Holcomb*, 433 F.3d at 901. If the employer satisfies that burden, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the evidence." *Jones v. Bernanke*, 557 F.3d at 677. A plaintiff has the burden of persuasion to show that a defendant's proffered non-discriminatory reason for the challenged action is a pretext. *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 654 (D.C. Cir. 2003). A plaintiff can carry this burden by showing that a non-discriminatory reason offered by a defendant is "false," *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008), or otherwise "presenting enough evidence to allow a reasonable trier of fact to conclude that the proffered explanation is unworthy of credence." *Desmond v. Mukasey*, 530 F.3d 944, 962 (D.C. Cir. 2008) (internal quotation marks omitted). Where "the employer's stated belief about the underlying facts is reasonable in light of the evidence, however, there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts," and summary judgment is appropriate. *Brady*, 520 F.3d at 495; *see also Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir. 1997) ("[I]f [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for [retaliation], summary judgment must be entered against [plaintiff].")

Defendants have articulated a legitimate, non-retaliatory reason for terminating plaintiff:

---

[21]Defendants initially argued that plaintiff's could not establish a prima facie case because there was no causal connection between the internal complaint plaintiff filed in March 2009 and plaintiff's termination in October 2009. However, as plaintiff's opposition makes clear, his claim of retaliation is based on the EEOC complaint plaintiff filed in August 2009.

namely, plaintiff's job-related weaknesses and his poor attitude, which began shortly after his

promotion to Team Lead and persisted until his termination.[22]  (Defs.' Mem. at 13-14 ("the Court

can ascertain from the spirit and tone on the face of the emails (particularly those he sent to Ms.

Pesut in September and October 2009) that [p]laintiff's own behavior left Ms. Pesut with no

choice but to terminate him.")  Plaintiff argues that defendants' proffered reasons for terminating

him are a pretext for retaliation.  However, the record supports the legitimate, non-retaliatory

nature of defendant's explanation, and plaintiff has failed to demonstrate that it is pretextual.

The record is replete with contemporaneous evidence that plaintiff was not performing his job

satisfactorily.  In addition, there is substantial evidence that plaintiff refused to do certain work

that Pesut thought he should do (and that Fannie Mae's outside investigators determined was not

outside the scope of plaintiff's job description).  Nor has plaintiff produced sufficient evidence

for a reasonable jury to find that Pesut's dissatisfaction with plaintiff's work performance and

attitude was not the actual reason for his dismissal.  *Brady*, 520 F.3d at 494.  Although plaintiff's

termination came only two months after he filed his EEOC complaint, mere temporal proximity,

while it can permit an inference sufficient to support a prima facie case of retaliation, "does not

resolve the question of retaliation *vel non*," which is the issue before the Court.  *Jones*, 557 F.3d

at 679.  Specifically, plaintiff has provided no evidence disputing that Pesut was dissatisfied with

his work performance *long before* he filed his EEOC complaint.  *See Clark County Sch. Dist. v.*

*Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned [actions]

upon discovering that a Title VII suit has been filed, and their proceeding along lines previously

---

[22]Defendants also argue that plaintiff's termination could not have been retaliation for the
August 2009 EEOC complaint because Pesut did not know it had been filed.  Plaintiff, however,
has filed an affidavit stating that he told Pesut about his EEOC case, which creates a disputed
issue of fact that cannot be resolved on summary judgment.

contemplated, though not yet definitively determined, is no evidence whatever of causality."); *see also Beckford v. Geithner*, 661 F. Supp. 2d 17, 24 (D.D.C. 2009); *Riggiladez v. Harvey*, 510 F. Supp. 2d 106, 110 (D.D.C. 2007) ("an adverse employment action following soon after the employee's engagement in the protected activity cannot establish causation if the employer contemplated the adverse action before the employee's protected activity").  Given the evidence that Pesut had long been displeased with plaintiff's performance, the mere temporal proximity between the EEOC complaint and plaintiff's termination does not satisfy plaintiff's burden. Considering "all relevant evidence," *Brady*, 520 F.3d at 495, a reasonable jury could not conclude that defendants' stated legitimate reason for termination was a pretext for retaliation. Accordingly, defendants are entitled to summary judgment on Count V.

## III.   DEFAMATION (Count II)

Plaintiff claims that Pesut defamed him when she sent Cooper the e-mail on October 1, 2008, stating that plaintiff's work papers contained information that was "identical" to a customer response – in effect, according to plaintiff, accusing him of plagiarism.

In the District of Columbia, "[a] plaintiff bringing a defamation action . . . must show: (1) that the defendant made a false and defamatory[23] statement; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the

---

[23]"A defamatory statement is one 'which tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community.'"  *Crowley v. North Am. Telecommunications Ass'n*, 691 A.2d 1169, 1172 n.2 (D.C. 1997) (quoting *Howard Univ. v. Best*, 484 A.2d 958, 988 (D.C. 1984)) (other internal quotations omitted); *see Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594 (D.C. 2000).  "But not every uncomplimentary publication is libelous. '[A]n allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear 'odious, infamous or ridiculous.'" *Guilford Transp. Indus.*, 760 A.2d at 594 (quoting *Johnson v. Johnson Pub. Co.*, 271 A.2d 696, 697 (D.C. 1970)).

statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm[24] or that its publication caused the plaintiff special harm."[25]  *Crowley v. North Am. Telecommunications Ass'n*, 691 A.2d 1169, 1172 n.2 (D.C. 1997) (internal quotations omitted).

   "To be actionable, [a] statement[] . . . . must have been both false and defamatory." *Columbia First Bank v. Ferguson*, 665 A.2d 650, 655 (D.C. 1995) (citing *Kendrick v. Fox Television*, 659 A.2d 814, 819 (D.C. 1995)).  Thus, "[t]ruth is an absolute defense to defamation claims."  *See Olinger v. Am. Sav. & Loan Ass'n*, 409 F.2d 142, 144 (D.C. Cir. 1969). Defendants first argue that plaintiff's defamation claim fails because the undisputed facts establish that Pesut's statement was not "false."  Specifically, defendants argue that Pesut's e-mail to Cooper stated only the truth – that the two documents attached thereto contained language that appeared to be "exactly the same."  (Defs.' Ex. 10.)

   It is undisputed that the documents attached to Pesut's October 1, 2008 e-mail contain identical language.  (*See* Defs.' Exs. 10, 11.)  Plaintiff, however, asserts that the one-page document attached to Pesut's e-mail that she describes as his workpaper is "fabricated."  (Pl.'s Mem. at 19; Etoh Aff. ¶¶ 52, 33.)  If that were the case, the literal "truth" of her statement would not protect defendants from plaintiff's defamation claim.  *See Washington Times Co. v. Bonner*, 86 F.3d 836, 841 n.4 (D.C. Cir. 1936)  ("The facts asserted as predicate of the fair comment must

---

   [24]"One who publishes a slander that ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession, or of his public or private office, whether honorary or for profit, is subject to liability without proof of special harm."  Restatement (2d) of Torts § 573.

   [25]"Special harm . . . is the loss of something having economic or pecuniary value. Restatement (2d) of Torts § 573.

be true."). Thus, the question for the Court is whether the evidence is such that a reasonable jury could conclude that Pesut "fabricated" the one-page attachment to her e-mail.

Defendants assert that if the evidence is reviewed "in the totality of the circumstances," it is apparent that "[p]laintiff's attempt to discredit Ms. Pesut is implausible and insufficient to overcome dismissal."[26] (Defs.' Reply Mem. at 13.)  The Court agrees.  To support his charge of fabrication, he points out that the final version of the document is seven pages long – as compared to the single page attachment to Pesut's e-mail.  However, the evidence also shows that the document in question was "edited" on October 8, 2008, a full week after Pesut sent it to Cooper, a possible (and much more plausible) explanation for any discrepancy in the content of the two documents.[27]  (Pl.'s Ex. D.6.7.b)  In addition and significantly, the same language appears in final seven-page document, making plaintiff's suggestion that Pesut "fabricated" the first document even less plausible.  The bottom line is that there is no credible evidence to support plaintiff's charge of fabrication.  (See Pl.'s Exs. D.6.1 - D.6.8; Terrelonge Aff.; Geisbert Aff.)  As no reasonable jury could conclude that Pesut's statement was "false," defendants are entitled to summary judgment on the defamation claim.

## IV.     INTENTIONAL OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (Counts IV and VI)

Plaintiff brings two claims for intentional or negligent infliction of emotional distress: the first based on Cooper's use of the racial epithet "nigger" and the second based on Fannie Mae's

---

[26]Defendants also suggest that the Court take notice of the arbitrator's finding in the arbitration proceeding that credited Pesut's version of these events.  (Defs.' Reply at 13; Defs.' Ex. 32.)  However, any determinations made by the arbitrator in that proceeding have no bearing on the present action and have no relevance to this Court.

[27]One of the affidavits submitted by plaintiff states that the document was not edited after August 29, 2008 (Geisbert Aff. ¶ 7), but this statement conflicts with undisputed evidence.

issuance of a bad check.

### A.    Intentional Infliction of Emotional Distress

"'To succeed on the claim of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.'"  *District of Columbia v. Tulin*, 994 A.2d 788, 800 (D.C. 2010) (quoting *Minch v. District of Columbia*, 952 A.2d 929, 940 (D.C. 2008)).  "'Liability will not be imposed for mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Id.* (quoting *Carter v. Hahn*, 821 A.2d 890, 892-93 (D.C. 2003)).  "Instead, to be actionable, the conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  *Id.* (quoting *Carter*, 821 A.2d at 893).  "Intentional infliction of emotional distress has been characterized as the 'tort of outrage.'"  *Id.* at 801 (quoting *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 336 (2003)).  Furthermore, "in the employment context, courts "traditionally have been demanding in the proof required to support an intentional infliction of emotional distress claim.  *See Joyner v. Sibley Hospital*, 826 A.2d 362, 373 (D.C. 2003) (quoting *Kerrigan v. Britches of Georgetown*, 705 A.2d 624, 628 (D.C. 1997)).

Cooper's use of the racial epithet "nigger" when he ordered plaintiff out of his office in March 2009 does not satisfy this "stringent" standard."  *See Carey v. Edgewood Mgmt. Corp.*, 754 A.2d 951, 955-56 (D.C. 2000) ("If that standard means what it says, then the conduct alleged must truly be extraordinary to hold a defendant accountable for this tort.); *see Hollis v. Rosa Mexicano DC, LLC* , 582 F. Supp. 2d 22 (D.D.C. 2008).  His comment, though offensive, is not the type of action that courts have found meets this standard.  *See, e.g.*, *Lockamy v. Truesdale*,

182 F. Supp. 2d 26, 38 (D.D.C. 2001) (no claim based on allegation that plaintiff was "intentionally harassed, intimidated, and threatened by his supervisor . . . [who] instructed him he could not address white employees by their first names, told him that he could not speak to certain African-American employees, [and] cursed at him").  Indeed, comments like Cooper's are precisely what led the District of Columbia Court of Appeals to observe, when rejecting a claim for intentional infliction of emotional distress, that the "rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind.'"  *King v. Kidd*, 640 A.2d 656, 668 (D.C. 1993) (quoting Restatement (Second) of Torts § 46 cmt. d).

As for Fannie Mae's issuance of a bad check, there is simply no evidence that Fannie Mae acted intentionally or recklessly when it issued the invalid check.  The Bernier Declaration thoroughly explains the unfortunate circumstances that led to its issuance, and plaintiff's disbelief of that explanation is insufficient to create a genuine dispute.  Moreover, even if plaintiff could show intent or recklessness, courts have disallowed claims based on far more egregious behavior than the issuance of a bad check.  *See, e.g.*, *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C. 1997) (employee who alleged that his supervisor "targeted him for a sexual harassment investigation, manufactured evidence against him in order to establish a false claim of sexual harassment, leaked information from the investigation to other employees, and unjustifiably demoted him" did not have a claim of intentional infliction of emotional distress because the supervisor's conduct did not rise to the necessary level of outrageousness); *Williams v. Fed. Nat. Mortg. Ass'n*, Civil Action No. 05-1483, 2006 WL 1774252, at *10 (D.D.C. June 26, 2006) (no claim based on employer's "active, conspiratorial, malicious and secretive attempts to .

41

. . terminate [plaintiff's] prospective and ongoing business relationships" and "efforts to damage her personal and business reputation"); *Adams v. George W. Cochran & Co., Inc.*, 597 A.2d 28, 35 (D.C. 1991) (no claim where employer dismissed employee for refusing to disobey law by driving truck without proper inspection sticker); *Waldon v. Covington*, 415 A.2d 1070, 1077-78 (D.C.1980) (no claim where employer refused to give employee-professor keys to laboratory and notice of departmental meetings, threatened to begin actions to test competency with aim to terminate, and assigned employee classes outside specialty knowing it would cause difficulty and embarrassment); *Hoffman v. Hill & Knowlton, Inc.*, 777 F. Supp. 1003, 1005 (D.D.C. 1991) (no claim where employer intentionally interfered with employee's ability to do job, stated false, pretextual reasons for dismissing an employee knowing it would be communicated to others, and dismissed employee).

Accordingly, defendants are entitled to summary judgment on plaintiff's claims for intentional infliction of emotional distress.

### B.    Negligent Infliction of Emotional Distress

Under District of Columbia law, a plaintiff can recover for negligent infliction of emotional distress only if the emotional distress "results from a direct physical injury," *District of Columbia v. McNeill*, 613 A.2d 940, 943 (D.C. 1992); if defendant's negligence placed the plaintiff in a "'zone of physical danger'" such that plaintiff "was caused by defendant's negligence to fear for his or her own safety,'" *id.* (quoting *Williams v. Baker*, 572 A.2d 1062, 1067 (D.C. 1990)); *see Mackey v. United States*, 8 F.3d 826, 831 (D.C. Cir. 1993); or "if the plaintiff can show that (1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would cause

42

serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 810-11 (D.C. 2011). Plaintiff's claims do not fit into any of these categories. First, plaintiff obviously did not suffer a "direct physical injury" from either Cooper's comment or Fannie Mae's issuance of a bad check. Nor did either event placed him in a "zone of physical danger" such that he was "made thereby to fear for his own safety." Clearly, Cooper's comment did not place plaintiff in a "zone of physical danger." As for the bad check, the only argument plaintiff makes is that he feared for his own safety because the police could have come to arrest him when he tried to cash the bad check and hurt him in the process. If the Court accepted plaintiff's theory, it would be holding Fannie Mae responsible for a third-party's behavior. There is no legal support for expanding the tort of negligent infliction of emotional distress to a clearly hypothetical scenario. Finally, plaintiff does not have a relationship with the defendants "of a nature that necessarily implicates [his] emotional well-being." *Cf. Hedgepeth* , 22 A.3d at 812 ("There are some relationships, such as that of psychiatrist/therapist and patient, where care for the emotional well-being of the patient is the very subject and purpose of the engagement, and it can be said that the psychiatrist or therapist has undertaken to care for the patient's emotional well-being, making it especially likely that the therapist's negligence will cause the patient to suffer emotional distress.") Accordingly, defendants are entitled to summary judgment on plaintiff's claims for negligent infliction of emotional distress.

## CONCLUSION

Accordingly, and for the reasons stated above, defendants' motion for summary judgment will be granted.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: September 23, 2011